785 F.2d 424
 Gerald STAPLETON, Petitioner,
v.
WESTMORELAND COAL COMPANY, Respondent,
Director, Office of Workers' Compensation Programs, U.S.
Department of Labor, Benefits Review Board, Intervenor.
Luke R. RAY, Petitioner,
v.
JEWELL RIDGE COAL CORPORATION and Director, Office of
Workers' Compensation Programs, United States
Department of Labor, Respondents.
Director, Office of Workers' Compensation Programs, Intervenor.
MULLINS COAL COMPANY, INC. OF VIRGINIA, and Old Republic
Industries, Petitioners,
v.
Glenn CORNETT and Director, Office of Workers' Compensation
Programs, United States Department of Labor, Respondents.
 Nos. 83-2193(L), 84-1520 and 84-1528.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 2, 1985.
Decided Feb. 26, 1986.
 
 Mark E. Solomons, C. Randall Lowe, S. Strother Smith (Yeary & Tate, P.C. on brief), for petitioner.
 Hugh P. Cline, David A. Barnett, J. Michael O'Neill (Michael F. Blair on brief), for respondent.
 Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN, WILKINSON, and SNEEDEN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Gerald L. Stapleton and Luke R. Ray appeal decisions by the Benefits Review Board (BRB) denying black lung benefits. Mullins Coal Company appeals a decision of the BRB granting black lung benefits to Glenn Cornett. These cases each involved the interim presumption and its rebuttal under 20 C.F.R. Sec. 727.203 and were consolidated for the purpose of appeal.
 
 
 2
 For the reasons variously expressed in the opinions of Judges Hall, Sprouse, and Widener (which opinions, one or others, are joined by Chief Judge Winter and Judges Chapman, Wilkinson and Sneeden), we hold that the interim presumption under Sec. 727.203(a)(1), (2), or (3) is established when there is credible evidence that a qualifying X-ray indicates the presence of pneumoconiosis, a single qualifying set of ventilatory studies indicates, pursuant to the regulatory standard, a chronic respiratory or pulmonary disease, or a single qualifying set of blood gas studies indicates, pursuant to the regulatory standard, an impairment in the transfer of oxygen from the lungs to the blood.
 
 
 3
 For the reasons variously expressed in the opinions of Judges Hall, Sprouse, and Widener (which opinions, one or others, are joined by Chief Judge Winter and Judges Chapman, Wilkinson and Sneeden), we hold that the interim presumption under Sec. (a)(4) is established by one qualifying physician's opinion, i.e., one which meets the regulations' requirements.
 
 
 4
 For reasons variously expressed in the opinions of Judges Phillips and Widener (which opinions, one or the other, are joined by Judges Russell, Murnaghan, Ervin, Chapman, and Wilkinson), we hold that, absent a qualifying physician's opinion, the interim presumption under (a)(4) is established by weighing, under the customary rules of evidence (which require the facts upon which a presumption is based to be proven by a preponderance of the evidence), the "other medical evidence," i.e., medical evidence other than X-rays, ventilatory studies, and blood gas studies.
 
 
 5
 For the reasons variously expressed in the opinions of Judges Phillips and Widener (which opinions, one or the other, are joined by Judges Russell, Murnaghan, Ervin, Chapman, and Wilkinson), we hold that, when considering under 20 C.F.R. Sec. 727.203(b) the rebuttal of a presumption established under Sec. (a), all relevant medical evidence must be considered and weighed, including, but not exclusively, nonqualifying X-rays, test results, and opinions, regardless of the section under which the presumption was invoked. This consideration is limited only by the single X-ray statute, 30 U.S.C. Sec. 923(b) (a claim may not be denied solely on the basis of one negative chest X-ray).
 
 
 6
 For the reasons variously expressed in the opinions of Judges Hall, Sprouse, and Widener (which opinions, one or others, are joined by Chief Judge Winter and Judges Chapman, Wilkinson and Sneeden), Consolidated Coal Company v. Sanati, 713 F.2d 480 (4th Cir.1983), is overruled insofar as it holds that one qualifying physician's opinion does not necessarily invoke the presumption, but, for the reasons expressed in the opinions of Judges Phillips and Widener (which opinions, one or the other, are joined by Judges Russell, Murnaghan, Ervin, Chapman, and Wilkinson), its reasoning remains the law in this circuit in considering whether or not the presumption is established under (a)(4) in the absence of a qualifying physician's opinion.
 
 
 7
 For the reasons variously expressed in the opinions of Judges Phillips and Widener (which opinions, one or the other, are joined by Judges Russell, Murnaghan, Ervin, Chapman, and Wilkinson), we hold that Whicker v. United States Department of Labor Benefits Review Board, 733 F.2d 346 (4th Cir.1984), and Hampton v. United States Department of Labor Benefits Review Board, 678 F.2d 506 (4th. Cir.1982) (per curiam), are overruled.
 
 
 8
 For the reasons expressed in part IIIB of Judge Hall's opinion (which is joined by all of the judges), we hold that interest on an award of black lung benefits shall accrue only from thirty days after the first agency decision awarding benefits.
 
 
 9
 Accordingly, our decision in each of the three consolidated cases is as follows:
 
 
 10
 Gerald L. Stapleton: The ALJ properly invoked the interim presumption and correctly found it rebutted. Stapleton's claim for benefits was properly denied. We affirm.
 
 
 11
 Luke R. Ray: The ALJ should have invoked the interim presumption. The BRB's decision is vacated, and Ray's claim is remanded for a determination of whether or not the presumption is rebutted.
 
 
 12
 Mullins Coal Company: The ALJ properly invoked the interim presumption and found it unrebutted. We affirm the award of benefits to Glenn Cornett. We remand, however, for a calculation of interest on his benefits in accordance with this opinion.
 
 K.K. HALL, Circuit Judge:
 I.
 Introduction
 
 13
 These three black lung cases were consolidated for en banc review, because they each involve a common legal issue, concerning the type and quantum of proof necessary to trigger and rebut the interim presumption of pneumoconiosis under 20 C.F.R. Sec. 727.203, and because our past panel decisions in this area have been contradictory and confusing.[1] The regulation at issue states in pertinent part as follows:Sec. 727.203 Interim presumption
 
 
 14
 (a) Establishing interim presumption. A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of death, or death will be presumed to be due to pneumoconiosis, arising out of that employment, if one of the following medical requirements is met:
 
 
 15
 (1) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis ...;
 
 
 16
 (2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in Sec. 410.412(a)(2) of this title) as demonstrated by values which are equal to or less than [certain values specified in the regulation's tables];
 
 
 17
 (3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood as indicated by values which are equal to or less than [certain values specified in the regulation's tables];
 
 
 18
 (4) Other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment; ...
 
 
 19
 (b) Rebuttal of interim presumption. In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:
 
 
 20
 (1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work ...; or
 
 
 21
 (2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work ...; or
 
 
 22
 (3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or
 
 
 23
 (4) The evidence establishes that the miner does not, or did not, have pneumoconiosis.
 
 II.
 Factual Background
 A. Stapleton
 
 24
 Stapleton was forty-three years old in 1980 when his claim for black lung benefits was heard by an Administrative Law Judge ("ALJ"). Stapleton had worked in coal mines for at least fifteen to sixteen years and was last employed by respondent, Westmoreland Coal Company ("Westmoreland"), from May, 1969, until June, 1972. At that time, he stopped working as a result of breathing difficulties and heart problems.
 
 
 25
 A 1973 x-ray noted minimal pneumonitis but otherwise clear lungs. An x-ray read by Dr. Shiv Navani, a B reader,[2] on November 30, 1976, indicated an increase in small nodular and linear densities throughout the lungs consistent with changes of coal worker's pneumoconiosis. Another x-ray dated January 21, 1980, was read by Dr. John G. Byers, a B reader, who concluded there was "essentially" no evidence of pneumoconiosis. This x-ray was re-read by Dr. Paul Francke, also a B reader, on July 24, 1980. Dr. Francke found no x-ray evidence of pneumoconiosis.
 
 
 26
 There were two pulmonary function studies received into the record. A 1976 study showed qualifying values, i.e. values below the maximum values specified in the regulation, but noted poor effort on the part of Stapleton. A 1980 study reflected non-qualifying values, i.e. values above the maximum, and likewise indicated poor effort and cooperation.
 
 
 27
 Also introduced into the record were two arterial blood gas studies, one performed in 1976 and another conducted in 1980. The results of both studies were above the regulation's maximum values and were, therefore, non-qualifying.
 
 
 28
 In addition, the evidence included medical reports of various physicians. In a report dated March, 1973, Anthony F. Leger, M.D., one of Stapleton's treating physicians, stated that claimant suffers from sinus tachycardia (rapid heart beat) and was hospitalized in July, 1972, because of his heart disorder. Dr. Leger also noted that Stapleton had been hospitalized in Norton, Virginia, in December, 1970, when he developed acute back pain while lifting a heavy object. There is no reference in Dr. Leger's records to any pulmonary or respiratory difficulty.
 
 
 29
 In a letter dated June 23, 1973, Daniel Gabriel, M.D., Stapleton's regular treating physician, wrote to claimant's counsel as follows:
 
 
 30
 I wish I could give you a more favorable report.
 
 
 31
 I first saw Mr. Stapleton in June, 1972 with chief complaint of shortness of breath, chest pain and rapid heart. At my insistence, he quit working because of his heart condition.
 
 
 32
 In my letter to you of 1972 concerning his low back injury in 1970, it did not disable him for work as you know he was working. I have no records of this condition other than his statement.
 
 
 33
 Dr. S.K. Paranthaman, who examined the claimant in 1976 at the request of the United States Department of Labor, found that Stapleton had evidence of pneumoconiosis and possible bronchitis. Dr. Paranthaman noted, however, that claimant's respiratory impairment was moderate and that "the functional impairment appears to be primarily from cardiac condition and back pain."
 
 
 34
 Stapleton was also examined in April, 1980, by Dr. John G. Byers, who concluded that there was not sufficient evidence to justify a diagnosis of pneumoconiosis. According to Dr. Byers, claimant had "no significant pure respiratory symptoms other than dyspnea," which the physician attributed to Stapleton's cardiac disease. Dr. Byers further stated that:
 
 
 35
 Disability is difficult to evaluate in this gentleman's case. His respiratory impairment is not fully evaluated because of his poor co-operation on pulmonary function testing. Certainly the best curve that he was able to give us would not indicate significant respiratory impairment. There is an abnormality of arterial blood gases which is not fully explained and which might be associated with dyspnea on moderate exertion. I am attributing this abnormality to temporary factors associated with his heart rate of 160 beats per minute caused by his cardiac disease. Note that several years ago PO2 was in the normal range on another test. I think this patient has significant disability based on neurosis, and he probably has significant disability based on his cardiac disease which is not yet in control on his Inderal.... As noted above, I feel that this patient's primary impairment is cardiac in nature with a strong component of cardiac neurosis.
 
 
 36
 A report, dated June 30, 1980, was submitted by Dr. George O. Kress, a specialist in industrial pulmonary medicine. Dr. Kress, a non-examining physician, reviewed the record and concluded that Stapleton did not suffer from pneumoconiosis, or from any significant respiratory problems. According to Dr. Kress, problems unrelated to claimant's coal mine employment probably precluded his ability to do work requiring significant effort.
 
 
 37
 Based on this evidence, the ALJ invoked the interim presumption under 20 C.F.R. Sec. 727.203(a)(1), citing Dr. Navani's positive x-ray, but concluded that the presumption was adequately rebutted by other medical evidence under 20 C.F.R. Sec. 727.203(b)(4), which included the more recent negative x-ray report of Dr. Byers. The ALJ also concluded that no other evidence qualified Stapleton as disabled due to a respiratory or pulmonary impairment. The one set of positive ventilatory studies was discounted because of poor cooperation. The ALJ, therefore, denied benefits. In reviewing this decision, the Board concluded that, although the ultimate decision denying benefits was correct, the ALJ had improperly invoked the presumption on the basis of the one positive x-ray.
 
 B. Ray
 
 38
 Ray is a forty-seven year-old former coal miner who had sixteen years of coal mining employment when he quit working in 1973 due to stomach problems. Ten x-rays, six ventilatory studies, and six medical reports were introduced at the hearing on his claim for black lung benefits.
 
 
 39
 Among the x-ray reports was one in 1974 which was positive for pneumoconiosis but which was submitted by an unidentified reader with an illegible signature. A 1977 x-ray was interpreted as positive by one radiologist. The most recent x-ray in 1980 showed a "suspicion" of pneumoconiosis. All of the remaining x-rays were negative.
 
 
 40
 Two of the six doctors' reports showed pulmonary disability, but these were not given great weight by the ALJ because they failed to conclude definitively that the disability was from exposure to coal dust. One doctor reported in 1975 that it was "probably" due to coal dust. Another physician concluded in 1980 that it was due to cigarette smoking. A third doctor found Ray totally disabled in 1977; however, the blood gas and ventilatory studies performed by this physician were normal. Ray's treating physician diagnosed anxiety neurosis and chronic gastritis and stated in a letter dated July, 1979, "[a]s far as his pulmonary complaints are concerned, I think they are rather insignificant."
 
 
 41
 There were two positive ventilatory studies. The ALJ, however, found them to be outweighed by more recent negative studies. The ALJ, concluding that the presumption had not been triggered, denied benefits, and the Board affirmed.
 
 C. Mullins
 
 42
 Cornett, who was employed in coal mines for approximately thirty-six years, worked for Mullins from June, 1967, to April 30, 1976. In 1977, claimant suffered a heart attack. At that time his family physician, L.J. Fleenor, M.D., informed him he was suffering from black lung disease. Claimant tried to return to his coal mine employment, but suffered from shortness of breath and coughing. In less than a year, he completely ceased work at the coal mine and began to work at his family's hardware store.
 
 
 43
 The medical evidence, introduced in connection with Cornett's claim for black lung benefits, included both positive and negative x-rays, as well as qualifying and non-qualifying ventilatory and blood gas studies. In addition, there were conflicting opinions of two physicians. Dr. Fleenor submitted a report, dated February, 1979, in which he diagnosed black lung disease. Robert A. Abernathy, M.D., a specialist in internal medicine, examined Cornett in January, 1980, and concluded that his "major problem appears to be related chiefly to his hypertension and to his heart disease." Dr. Abernathy recognized that Cornett "does appear to have some pulmonary impairment" and was precluded from returning to coal mining work; however, in a supplemental report dated August 1, 1980, Dr. Abernathy expressed his belief that claimant's breathing problems were related not to his exposure to coal dust but to his hypertension, cardiovascular impairments, and possibly smoking.
 
 
 44
 Following the administrative hearing on Cornett's claim, the ALJ found that claimant was entitled to invoke the presumption under 20 C.F.R. Sec. 727.203(a)(1), (a)(2), and (a)(3). As for rebuttal, the ALJ concluded that:
 
 
 45
 the medical evidence consisting of Claimant's ventilatory studies, blood-gas tests, and Dr. Abernathy's opinion that the Claimant is substantially precluded from doing any work beyond what he appears to be doing at the hardware store overwhelming [sic] establishes a respiratory impairment that causes Claimant to be incapable of performing his usual or comparable work....
 
 
 46
 Dr. Fleenor also diagnosed cardiovascular disease in addition to category 1 pneumoconiosis and he attributed Claimant's disability to both impairments. Testimonial evidence has established that Dr. Fleenor is Claimant's treating physician. Further, there is no indication that Dr. Abernathy has examined the Claimant more than once. Therefore, Dr. Fleenor's opinion may be given greater weight than that of a physician who has examined the Claimant on only one occasion.
 
 
 47
 The ALJ awarded benefits, and also awarded interest at a rate of six percent per year to commence as of July, 1978, the date of claimant's eligibility. The Board affirmed.[3]
 
 III.
 Discussion
 
 48
 In our order setting these three appeals for en banc argument, the parties were requested to address the following issues:
 
 
 49
 (1) Whether, despite the evidence of negative or non-qualifying x-rays, ventilatory studies, blood gas studies, and/or physicians' opinions, the interim presumption of pneumoconiosis under 20 C.F.R. Sec. 727.203(a) is automatically triggered by any one of the following:
 
 
 50
 (a) one positive x-ray;
 
 
 51
 (b) one set of positive ventilatory studies;
 
 
 52
 (c) one set of positive blood gas studies;
 
 
 53
 (d) one physician's opinion.
 
 
 54
 (2) Once the interim presumption of pneumoconiosis is triggered, whether and to what extent is non-qualifying medical evidence permitted to rebut the presumption under 20 C.F.R. Sec. 727.203(b).
 
 
 55
 In addition to these common issues, the Court must consider in Mullins whether it is proper in black lung cases to award interest to a claimant on past due benefits from the date he is eligible for payment rather than from the time a favorable decision is issued.
 
 
 56
 In Section III.A. of this opinion, I will address first the issues concerning the interim presumption. I am authorized to state that Chief Judge Winter, Judge Sprouse, and Judge Sneeden join me in Section III.A. Section III.B. sets forth the Court's unanimous opinion concerning the pre-judgment interest issue raised in Mullins.
 
 A. Interim Presumption
 
 57
 Black lung disease, or pneumoconiosis, is a severe and frequently crippling chronic respiratory impairment which is caused by long-term inhalation of coal mine dust. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 6-7, 96 S.Ct. 2882, 2888, 49 L.Ed.2d 752 (1976). The federal black lung program was enacted to provide benefits for total disability due to black lung disease. The program was originally enacted in Title IV of the Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91-173, 83 Stat. 792 (1969). The program has been amended on three occasions: Black Lung Benefits Amendments of 1972, Pub.L. No. 92-303, 86 Stat. 150 (1972) (the "1972 amendments"); Black Lung Benefits Revenue Act of 1977, Pub.L. No. 95-227, 92 Stat. 11 (1977) and Black Lung Benefits Reform Act of 1977, Pub.L. No. 95-239, 92 Stat. 95 (1977), signed into law on March 1, 1978 (the "1978 amendments"); and Black Lung Benefits Amendments of 1981, Pub.L. No. 97-119, 95 Stat. 1643 (1981) (the "1981 amendments").
 
 
 58
 The responsibility for adjudicating claims has shifted from the Social Security Administration (the "SSA") to the Department of Labor (the "DOL"). The 1972 amendments provided that claims filed on or before June 30, 1973 (Part "B" claims) would be adjudicated by SSA. See generally 20 C.F.R. Part 410. Claims filed after that date (Part "C" claims) would be adjudicated by DOL. Under this system, Part "C" claimants were subjected to more restrictive eligibility criteria than Part "B" claimants. The 1978 amendments, however, eliminated the restrictive standards applicable to Part "C" claims, liberalized the statutory eligibility criteria, and authorized the Secretary of Labor to adopt new criteria which were no more restrictive than the eligibility standards governing Part "B" claims. 30 U.S.C. Sec. 902(f)(2). In accordance with this intent and pursuant to 30 U.S.C. Sec. 902(f),[4] the Secretary promulgated interim criteria at 20 C.F.R. Sec. 727.200 et seq., including the presumption at issue in these appeals at Sec. 727.203,[5] which is set out in full in the Introduction to this opinion.
 
 
 59
 The employers in each case, as well as the Director of the Office of Workers' Compensation Programs ("Director"), whom we permitted to intervene in these appeals, contend that the regulation at 20 C.F.R. Sec. 727.203(a) requires the ALJ to weigh all evidence, both positive and negative, before invoking the interim presumption. Under this view, the presumption is triggered only if there is a preponderance of like-kind positive evidence. According to the employers and the Director, the presumption is not triggered by a single positive x-ray, ventilatory or blood gas test, or by one physician's opinion, unless that single piece of evidence stands uncontradicted by like-kind evidence. I cannot agree. Although, as the opinion of Judge Phillips indicates, the Director's view on this issue is, if reasonable, entitled to judicial deference, I find that the agency's interpretation renders the regulation internally inconsistent and is plainly erroneous. Moreover, I conclude that the agency's interpretation conflicts with congressional intent.
 
 
 60
 Legal presumptions, such as the one at issue in these appeals, are encountered in a variety of civil, criminal and administrative settings. A presumption is raised by a basic fact or facts which, when accepted as true by the factfinder, give rise to a mandatory inference called a presumed fact. Graham C. Lilly, An Introduction to the Law of Evidence, Chapter III, at 49 (1978). "Once the basic [fact or] facts are believed, the resulting presumed fact must be accepted by the trier unless it is rebutted by contravening evidence." Id.
 
 
 61
 The initial burden of meeting the factual prerequisite for triggering a presumption is distinct from the ultimate burden of convincing the factfinder of the existence of all the essential elements of a claim or defense. Meeting the initial burden, however, has the effect of shifting the burden of persuasion, or at least the burden of coming forward with rebuttal evidence, onto the opposing party. Id. at 49, 54-58.
 
 
 62
 With these principles in mind, I have examined the statutory and regulatory scheme of the presumption at issue in these appeals. At the outset I note that Congress has mandated that in deciding black lung claims all relevant evidence be considered:
 
 
 63
 In determining the validity of claims under this part, all relevant evidence shall be considered, including, where relevant, medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials.
 
 
 64
 30 U.S.C. Sec. 923(b).
 
 
 65
 The Conference Report, accompanying the 1978 amendments, states that:
 
 
 66
 With respect to a claim filed or pending prior to the promulgation of such [new] regulations such regulations shall not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973, except that in determining claims under such criteria all relevant medical evidence shall be considered in accordance with standards prescribed by the Secretary of Labor and published in the Federal Register.
 
 
 67
 H.R.Rep. No. 864, 95th Cong., 2d Sess., reprinted in [1978] U.S.Code Cong. & Ad.News 237, 308, 309. As pointed out in an article analyzing the legislative history of the interim presumption, "[b]y this [Conference Report] statement, the conferees alerted the Secretary of Labor that he was not to treat the interim presumption as irrebuttable." Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of its Unresolved Issues, 83 W.VA.L.REV. 869, 893 (1981). Thus, by statute, the disposition of a black lung claim must be based on all relevant evidence and the presumption which the Secretary was directed to promulgate must be rebuttable. The statute, however, leaves to the Secretary how the presumption is to be triggered and rebutted and how the various burdens of persuasion and production are to be allocated between the claimant and the employer.
 
 
 68
 The regulation promulgated by the Secretary is divided into two parts. The first part, Part (a), enumerates four distinct medical requirements which, if met, "establish" the interim presumption. The second part of the regulation, Part (b), addresses the requirements for rebutting a presumption which has been established under Part (a). Part (a) by its own terms calls for the presumption to be triggered under (a)(1) by "[a ] chest roentgenogram (x-ray)," and under (a)(4) if "[o]ther medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment" (emphasis added). Thus, with respect to these two medical requirements, I can only conclude that a single qualifying x-ray or a single physician's opinion that a claimant has a disabling pulmonary impairment will clearly suffice to trigger the presumption. Of course, certain minimal requirements of reliability and authenticity must be met, including identification of the physician reading the x-ray or rendering the opinion, the date of the report, and compliance with any applicable quality standards for x-rays found elsewhere in the regulations. See 20 C.F.R. Secs. 727.206(a), 718.102, 718.104, 410.428.
 
 
 69
 Concerning the medical requirements under Sec. 727.203(a)(2) and (a)(3), the regulation employs the terms "ventilatory studies" and "blood gas studies" in the plural. Nevertheless, I conclude that a reasonable interpretation of this language requires the presumption to be triggered if the results of one set of ventilatory or blood gas studies demonstrate values above those listed in the tables.[6] I note that this interpretation is fully supported by the regulations which define how ventilatory and blood gas tests are to be conducted. These regulations demonstrate that each pulmonary function study consists of several tests and must be accompanied by two to three tracings of each test performed. 20 C.F.R. Secs. 718.103; 410.430. Similarly, a blood gas study may also have separate components, one reflecting the results obtained at rest, and the other reporting the results of testing during exercise. 20 C.F.R. Sec. 718.105.
 
 
 70
 Certainly, I find nothing in Part (a) of the regulation which permits--much less requires--the weighing of conflicting like-kind evidence by the factfinder before triggering the presumption. In fact, the view espoused by the Director that all evidence must be weighed before invoking the presumption renders the rebuttal phase of the inquiry superfluous. Judge Phillips' opinion, in finding the Director's position on this point reasonable, effectively rewrites the rebuttal portion of the regulation and makes the presumption once triggered, at least in part, irrebuttable.[7] This interpretation, which renders the regulation internally inconsistent and contradictory, cannot withstand the test of reasonableness under any conceivable criteria. Moreover, insofar as it makes the presumption irrebuttable, it clearly conflicts with congressional intent.
 
 
 71
 I would accordingly overrule our previous decision in Consolidation Coal Co. v. Sanati, 713 F.2d 480 (4th Cir.1983), which held that the ALJ must weigh conflicting evidence before determining whether the presumption has been triggered. I would hold instead that under the plain meaning of 20 C.F.R. Sec. 727.203(a), the claimant satisfies his initial burden of production if he introduces into evidence one qualifying x-ray, one set of qualifying ventilatory or blood gas studies, or the documented opinion of one physician exercising reasoned medical judgment.[8] Contrary to the conclusion reached by Judge Widener and a majority of this Court that in the absence of a physician's opinion other medical evidence must be weighed before the (a)(4) presumption is triggered, I conclude that a physician's opinion is an absolute prerequisite to invoking the presumption under (a)(4) and that consequently weighing of the evidence is not appropriate.
 
 
 72
 Once the claimant's initial burden has been satisfied and the presumption is triggered, the burden necessarily shifts to the employer to rebut it. Under Part (b) of the regulation, rebuttal of the interm presumption is subdivided into four categories. The presumption is rebutted if the employer establishes that (1) the miner continues in his usual coal mine work or in gainful employment requiring similar skills and abilities; (2) the miner is able to do his usual coal mine work or gainful work requiring similar skills and abilities; (3) the miner's death or disability did not arise, in whole or in part, out of coal mine employment; or (4) the miner does not have pneumoconiosis. 20 C.F.R. Sec. 727.203(b).
 
 
 73
 It is in the rebuttal portion of the regulation, after the burden has shifted to the employer, that the Secretary incorporated Congress' "all relevant evidence" language, requiring that "[i]n adjudicating a claim under this subpart, all relevant medical evidence shall be considered." 20 C.F.R. Sec. 727.203(b). In my view, placement of this language is not, as the employers argue, awkward or inexact, but entirely appropriate and consistent with congressional intent. For it is after hearing the rebuttal phase of a case where the presumption has been invoked, and determining whether the employer has sustained its burden of proving by a preponderance of the evidence that the claimant does not have pneumoconiosis, or does not otherwise meet the criteria for eligibility found at Sec. 727.203(b)(1)-(b)(4), that the factfinder is in a position to make a final decision on the claim based on the weighing of "all relevant evidence."
 
 
 74
 As we concluded in addressing the employer's rebuttal obligation under Sec. 727.203(b)(3), in Bethlehem Mines Corp. v. Massey, 736 F.2d 120, 123-124 (4th Cir.1984):
 
 
 75
 [T]he employer must rule out the causal relationship between the miner's total disability and his coal mine employment in order to rebut the interim presumption ... The reality of coal mine employment is such that many physical and environmental factors may converge to produce a totally disabling respiratory or pulmonary impairment. The Secretary's rebuttal regulation acknowledges this reality and, consistent with the letter and spirit of the Black Lung Act and traditional workers' compensation principles, places the burden on the employer to disprove the causal relationship between coal mine employment and total disability once the claimant establishes the existence of a qualifying medical condition. (emphasis added).
 
 
 76
 Massey correctly recognized the effect of shifting the burden of persuasion onto the employer once the presumption under Sec. 727.203(a) had been invoked. In Alabama By-Products v. Killingsworth, 733 F.2d 1511, 1514 (11th Cir.1984), the Eleventh Circuit similarly concluded that:
 
 
 77
 The plain meaning of the regulatory language of 20 C.F.R. Sec. 727.203(b) demonstrates that the burden of persuasion shifts to the employer on rebuttal. Under section 727.203(b), the employer is required to "establish" the elements of rebuttal. "Establish" is clearly synonymous with "prove." Furthermore, under section 727.203(b), the factfinder must consider "all relevant medical evidence" to determine if the presumption has been rebutted, thus indicating that the factfinder must consider evidence introduced by both sides and that the operator must persuade the factfinder.
 
 
 78
 (footnote omitted). The Sixth and the Tenth Circuits have likewise concluded that the burden of persuasion under Sec. 727.203(b) shifts to the employer on rebuttal. Gibas v. Saginaw Mining Company, 748 F.2d 1112, 1120 (6th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); Kaiser Steel Corporation v. Director, Office of Workers' Compensation Programs, 748 F.2d 1426, 1430 (10th Cir.1984).
 
 
 79
 This statement of the employer's rebuttal obligation is, moreover, consistent with the interpretation of the employer's burden under the fifteen-year statutory presumption. Cf. United States Steel Corp. v. Gray, 588 F.2d 1022, 1028 (5th Cir.1979) ("The statute shifts to the Secretary or to the mine operator the burden of disproving disability due to pneumoconiosis once the claimant makes the threshold showing that he worked fifteen or more years in the mines and suffers a totally disabling respiratory or pulmonary impairment. The burden on the Secretary or operator is then to prove by a preponderance of evidence that the claimant does not suffer pneumoconiosis, as defined by the Act, or that the impairment is not connected with his employment in the mines.")[9]
 
 
 80
 Neither the statute nor the regulation addresses the quantum of evidence that constitutes a preponderance of all relevant evidence. To me, however, it is significant that Congress qualified the "all relevant evidence" standard by specifically providing that "no claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram." 30 U.S.C. Sec. 923(b). Id. Thus, I would find that neither a single negative x-ray nor multiple negative x-rays may constitute the sole basis for denying benefits.[10] Furthermore, I would continue to adhere to our holding in Whicker v. U.S. Dept. of Labor Benefits Review Board, 733 F.2d 346, 349 (4th Cir.1984), that "[n]on-qualifying test results ... cannot be used as the principal or exclusive means of rebutting an interim presumption of pneumoconiosis" under 20 C.F.R. Sec. 727.203(b) (emphasis added). To hold otherwise would, as we noted in Whicker, defeat "the specific language and purposes of the applicable regulations." Id. Nevertheless, I agree that non-qualifying test results may be part of the rebuttal inquiry under the "all relevant evidence" standard, and are particularly relevant when they are given a detailed interpretation by an examining physician in reaching a medical conclusion as to a claimant's impairment.
 
 
 81
 In summary, I conclude that in a black lung case involving use of the interim presumption in Part C claims, the claimant has the initial burden of producing evidence which meets one of the medical requirements listed in Sec. 727.203(a)(1) through (a)(4), i.e. one positive x-ray, one qualifying set of ventilatory or blood gas studies, or one physician's opinion. Of course, the evidence submitted by the claimant to trigger the presumption must conform to pertinent standards for quality and authenticity. Once the initial burden is satisfied, I would find that the burden of persuasion shifts to the employer, who then must prove by a preponderance of evidence that the claimant does not have pneumoconiosis, or that he continues to perform or is capable of performing his usual coal mine work, or that the impairment is not connected with his employment in the mines.
 
 
 82
 In deciding whether the presumption has been rebutted, and ultimately whether the claimant is entitled to black lung benefits, I agree that the factfinder must consider all relevant evidence, but with the proviso that (1) a claim may not be denied solely on the basis of any negative x-ray and (2) non-qualifying test results may not be the primary or exclusive means of rebutting the presumption.
 
 
 83
 In applying these views to the facts of the three cases before us, I conclude as follows:
 
 1. Stapleton
 
 84
 I would find that in Stapleton's case the ALJ correctly concluded that the 1976 positive x-ray was sufficient to invoke the interim presumption under (a)(1). Moreover, I would find that the presumption was also triggered under (a)(2) by the positive ventilatory study. Nevertheless, I would affirm the Board's denial of benefits on the ground that there is substantial evidence to demonstrate that the presumption was sufficiently rebutted. This evidence included the reports of Stapleton's treating physician and other examining physicians that claimant suffered from a cardiac disability rather than from a pulmonary impairment.
 
 2. Ray
 
 85
 In Ray's case, I cannot accept appellant's contention that the presumption was triggered under (a)(1) by the 1974 positive x-ray. This x-ray was not sufficiently identifiable to meet the regulatory requirements for an x-ray under 20 C.F.R. Sec. 718.102(c), which provides, inter alia, that "[t]he report shall specify the name and qualifications of the person who took the film and the name and qualifications of the physician interpreting the film." I would find, however, that because of the two qualifying ventilatory studies and the opinion of at least one physician that Ray was totally disabled due to a respiratory impairment, the presumption was triggered under (a)(2) and (a)(4). Because the ALJ incorrectly concluded that the presumption was not invoked, I would remand this case for a determination of whether the presumption was rebutted.[11]
 
 3. Mullins
 
 86
 I would find that there was sufficient evidence to invoke the presumption on behalf of the claimant, Cornett, under (a)(1), (a)(2), (a)(3), and (a)(4). Furthermore, I would affirm the Board's decision granting benefits on the ground that it is supported by substantial evidence and that the employer did not meet its rebuttal obligation.
 
 
 87
 As stated in the per curiam opinion summarizing the results in these cases, the award of benefits to Cornett is affirmed. However, in accordance with Part III. B. of this opinion, infra, in which all the judges have joined, that portion of the decision below which awarded interest on Cornett's claim back to July, 1978, is reversed and the case is remanded with directions that an appropriate award of interest be entered to commence thirty days after the date of the initial determination of eligibility.
 
 B. Pre-judgment Interest
 
 88
 The interest regulation at issue in Mullins, 20 C.F.R. Sec. 725.608(a) (1979), provides that:
 
 
 89
 If an operator or other employer fails or refuses to pay any or all benefits due under the terms of an initial determination by a deputy commissioner (Sec. 725.420), a decision and order filed and served by an administrative law judge (Sec. 725.478) or a decision filed by the Board or a United States court of appeals, including any penalty awarded in addition to benefits in accordance with Sec. 725.607, such operator shall be liable for 6 percent simple annual interest on all past due benefits computed from the date on which such benefits were due and payable ....
 
 
 90
 (Emphasis added).
 
 
 91
 The Director interprets the regulation to provide for the assessment of interest only from the date thirty days after the first favorable decision, whether made by the Deputy Commissioner in an initial determination, or by an ALJ, the Board, or a court of appeals. The Board has rejected the Director's interpretation and, as in this case, has construed 20 C.F.R. Sec. 725.608(a) to provide for the assessment of interest from the date of a claimant's eligibility under the Act, i.e., from the due date of any retroactive payment to which a claimant ultimately becomes entitled under a decision awarding benefits.
 
 
 92
 On appeal, Mullins and the Director contend that the Director's interpretation must be accorded deference and that the Board's substitution of its own interpretation of the interest regulation constitutes improper rulemaking and is erroneous as a matter of law. We agree.
 
 
 93
 The "common law rule is that the one who owes a sum of money at a date certain is obliged to pay interest for withholding payment." Howmet Aluminum Corp. v. Hartford Accident & Indemnity Co., 665 F.2d 476, 479 (3d Cir.1981). Thus, as a general rule, interest may be awarded only for the wrongful withholding of payment on a liquidated claim, after the payment obligation arises. Milgo Electronic Corp. v. United Business Communications, Inc., 623 F.2d 645, 667 (10th Cir.), cert. denied, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); New York Shipping Ass'n v. Federal Maritime Commission, 571 F.2d 1231, 1242 (D.C.Cir.1978).[12]
 
 
 94
 Moreover, although there was no statutory provision regarding interest on benefit awards until 1981, the 1981 amendments adopted the Director's interpretation. 30 U.S.C. Sec. 932(d) now provides that:
 
 
 95
 With respect to payments withheld pending final adjudication of liability in the case of claims filed on or after the effective date of the Black Lung Benefits Amendments of 1981 [January 1, 1982], such interest shall commence to accumulate 30 days after the date of the determination that such an award should be made.
 
 
 96
 We have held that "later acts of Congress should be accorded 'significant weight' in determining the intent of earlier legislation." Director, OWCP v. National Mines Corp., 554 F.2d 1267, 1275 (4th Cir.1977), quoting NLRB v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). The Board, however, rejected the Director's interpretation as the interpretation intended by Congress, relying (1) upon the position taken by the Director on the interest question in an earlier case, Honaker v. Jewell Ridge Coal Corp., 2 BLR 1-947 (Benefits Review Board, 1980), aff'd on other grounds mem. sub. nom. Jewell Ridge Coal Corp. v. Honaker, 649 F.2d 863 (4th Cir.1981); (2) upon the decision of this Court in Clinchfield Coal Co. v. Cox, 611 F.2d 47 (4th Cir.1979); and (3) upon case law developed under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 901 et seq., many of the provisions of which are incorporated into the Black Lung Benefits Act. We agree with Mullins and the Director that the Board's reliance was misplaced.
 
 
 97
 The claims in Cox and Honaker were processed and approved in accordance with the Black Lung Benefits Act of 1972, under which no interest regulation had been promulgated. Section 725.608(a), first promulgated in 1978 to implement the 1978 Amendments, was inapplicable to those claims. Neither the regulation nor the Director's interpretation of that regulation was at issue in either case. We hold, therefore, that the Board erred in relying on Cox and the Director's position in Honaker to reject the Director's interpretation of 20 C.F.R. Sec. 725.608(a) in the instant case. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).
 
 
 98
 The Board also erred in relying on the Longshoremen's Act. Interest under the Longshoremen's Act, like interest under the Director's interpretation of 20 C.F.R. Sec. 725.608(a), accrues only from the date that an employer first incurs a payment obligation for a liability on a disability claim. Cf. 33 U.S.C. Sec. 914(b), 918 and Strachan Shipping Co. v. Wedemeyer, 452 F.2d 1225 (5th Cir.1971), cert. denied, 406 U.S. 958, 92 S.Ct. 2060, 32 L.Ed.2d 344 (1972) with 20 C.F.R. Sec. 725.522(a). Given that fact, the Director's interpretation of 20 C.F.R. Sec. 725.608(a) comports with the manner in which interest is awarded under the Longshoremen's Act.
 
 
 99
 Even assuming otherwise, however, we conclude that the Board erred in relying on the Longshoremen's Act to interpret 20 C.F.R. Sec. 725.608(a). As this Court stated in National Mines Corp., supra, "[t]he Black Lung Act does not inflexibly incorporate every provision of the Longshoremen's Act." 554 F.2d at 1273. Instead, "Title 30 U.S.C. Sec. 932(a) specifically states that the provisions of the Longshoremen's Act shall be applicable 'except as the Secretary shall by regulation otherwise provide.' " Id. This indicates a "congressional intention to empower the Secretary to depart from specific requirements of the Longshoremen's Act in order to administer the black lung compensation program properly." Id. at 1274. Thus, the Board's review of the Director's interpretation of 20 C.F.R. Sec. 725.608(a) was governed not by the Longshoremen's Act, but, instead, by the Black Lung Benefits Act.
 
 
 100
 For the foregoing reasons, we uphold the Director's interpretation of the interest regulation as reasonable and find that interest shall accrue only from the date beginning thirty days after the first agency decision awarding black lung benefits. We accordingly reverse that portion of the decision in Mullins which awarded interest as of July 1, 1978.[13]
 
 
 101
 I am authorized to say that HARRISON L. WINTER, SPROUSE and SNEEDEN, JJ., join in this opinion.
 
 
 102
 JAMES DICKSON PHILLIPS, Circuit Judge, concurring in part and dissenting in part:
 
 
 103
 I concur in the result in No. 83-2193 (Stapleton/Westmoreland affirmed), in the result in No. 84-1528 (Cornett/Mullins affirmed in part and reversed in part), and in Part III B of Judge Hall's opinion dealing with prejudgment interest.
 
 
 104
 I dissent from the result in No. 84-1520 (Ray/Jewel Ridge reversed) and I disagree with major elements of the opinions of Judge Hall, Judge Widener, and Judge Sprouse respecting the meaning and application of 20 C.F.R. Sec. 727.203, the "interim presumption" regulation.
 
 
 105
 * I note at the outset that my perception of our proper function in interpreting this "interim presumption" regulation may differ in a critical respect from that of my brethren who come to different interpretations than mine. As I read their opinions, they reflect (though in different degrees) a general perception that we are free to interpret this regulation in the same way that we would interpret any statute or procedural rule having the force of statute, drawing on logic and legal reasoning and aided by the ordinary canons of statutory construction (including the "plain meaning" canon) to divine the promulgators' intent as reflected in the regulation's text.
 
 
 106
 The problem with that approach here is two-fold. First, we are not interpreting a statute or procedural rule having statutory force, but an agency's regulation promulgated by authority and direction of Congress. Second, we have before us the agency's own interpretation of the regulation's intended meaning and operation in the context of the cases we are reviewing.[1]
 
 
 107
 In this situation, our interpretive role in judicial review is narrowly circumscribed. It is not direct, free "construction" of the legal meaning of the regulation's text, but something quite different. We should address, in sequence, only two questions.
 
 
 108
 First: whether the agency's interpretation is "plainly erroneous or inconsistent with the regulation"? United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977). If it is not so, that interpretation is the "ultimate criterion" for determining legal meaning, and has "controlling weight" for that purpose. Id. (citing and quoting Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).
 
 
 109
 Second: If the agency's interpretation passes that deferential test and thereby supplies the regulation's legal meaning, whether the regulation as so construed is "consistent with the statute under which [it was] promulgated"? Larionoff 431 U.S. at 873, 97 S.Ct. at 2156. The regulation's ultimate validity--whether it has the force of law--may turn on this. Id.
 
 
 110
 In effect, this requires that we take the agency's interpretation as the starting point for our judicial review of the disputed issue of the regulation's legal meaning. Agency interpretation controls and has the force of law unless it is in the first instance "plainly erroneous or inconsistent with the regulation" itself or, beyond that, would yield a meaning for the regulation that is inconsistent with the authorizing statute. Only if the agency's interpretation were impermissible as interpretation or produced an invalid regulation should we decline to apply the regulation as so interpreted (and possibly substitute our own "saving" interpretation). See generally K. Davis, Administrative Law, Sec. 7.22 (2d ed. 1980).
 
 
 111
 Applying these principles of judicial review, I would hold the agency's interpretation here not plainly erroneous or inconsistent with the regulation, and the regulation as so interpreted not inconsistent with the authorizing statutes. On that basis, I would interpret and apply the regulation in accordance with the agency's interpretation rather than any conflicting one that we might come up with as a matter of original and independent construction, including that partially conflicting interpretation reached here by the en banc court.[2]II
 
 
 112
 The first question is whether the agency's interpretation is "plainly erroneous or inconsistent with the regulation." In addressing that, our only tools are "the plain words of the regulation and any relevant interpretations of the [agency]." Bowles, 325 U.S. at 414, 65 S.Ct. at 1217.
 
 
 113
 The agency interpretation, as presented in the Director's brief, can be summarized and paraphrased in its most salient aspects as follows.
 
 
 114
 1. Under the proof scheme of 20 C.F.R. Sec. 727.203, which creates a rebuttable presumption of compensable black lung disability, both claimant and operator bear opposing burdens of persuasion, the former to invoke the presumption, the latter to rebut the presumption if it is invoked.[3]
 
 
 115
 2. Under Sec. 727.203(a)(1)-(4), the claimant bears the initial burden of proving specified factual predicates: (a) that he is[4] a miner who engaged in coal mine employment for at least 10 years, and either that (b), as established by X-ray, biopsy, or autopsy, he has pneumoconiosis, Sec. 727.203(a)(1), or that (c) as established by ventilatory studies, he has a chronic respiratory or pulmonary disease as measured by specified clinical requirements and values, Sec. 727.203(a)(2), or that (d), as demonstrated by blood gas studies, he has a specified clinical level of impairment of his system's ability to transfer oxygen from lungs to blood, Sec. 727.203(a)(3), or that (e), as established by "[o]ther medical evidence, including the documented opinion of a physician exercising reasoned medical judgment," he has a totally disabling respiratory or pulmonary impairment, Sec. 727.203(a)(4).
 
 
 116
 3. If the claimant invokes the presumption by proving (a) and any one (or more) of (b)-(d), he has established a prima facie case of compensable disability. The burden of persuasion thereupon shifts to the operator to rebut the presumption, failing which the claimant is entitled to benefits.
 
 
 117
 4. Under Sec. 727.203(b)(1)-(4), the operator's burden of proof in rebuttal may only be carried by proof of facts that negate elements of the disability claim vel non that were not established to invoke the presumption. Thus, the presumption may be rebutted (a) by proof that the claimant is in fact doing or is able to do his usual coal mine work or comparable and gainful employment, unless the presumption was invoked by proof under Sec. 727.203(a)(4) that claimant had a totally disabling respiratory or pulmonary impairment, Sec. 727.203(b)(1), (2); or it may be rebutted (b) by proof that the disability established did not in fact arise in whole or in part out of coal mine employment, whatever the basis for invocation of the presumption, Sec. 727.203(b)(3); or it may be rebutted (c) by proof that the claimant does not have pneumoconiosis, unless the presumption was invoked by proof under Sec. 727.203(a)(1) that claimant does have pneumoconiosis, Sec. 727.203(b)(4).[5]
 
 
 118
 5. The burdens of persuasion borne by both claimant and operator respectively are burdens to prove the relevant facts by a preponderance of the evidence.
 
 
 119
 6. In applying this presumption-based proof scheme, claim adjudicators are required to consider "all relevant medical evidence," both in assessing whether the presumption has been invoked and whether it has then been rebutted.
 
 
 120
 I do not see how this interpretation, either in its general sweep or in its specific parts, could be declared "plainly erroneous or inconsistent with the regulation," looking, as we are required to do, only to the "plain words of the regulation" and the agency's interpretation of its own handiwork.
 
 
 121
 It is notorious in legal scholarship that the nature and intended operation of evidentiary presumptions rank among the greatest conceptual puzzles in the law. Attempts to categorize presumptions in systematic ways have long occupied and divided our best procedural scholars. See generally McCormick on Evidence Secs. 342-344 (3d ed. 1984). Only the most artful and knowledgeable legislative drafting (or judicial opinion) is likely to produce an evidentiary presumption whose intended operation--whether as rebuttable or irrebuttable, "bubble-bursting" or more drastic, etc.--is manifest from its plain text. Given the conceptual and practical difficulties involved, it is therefore no reproach to the drafters of the "interim presumption" of 20 C.F.R. Sec. 727.203 to start with the proposition that this presumption's intended operation is by no means manifest from its "plain words." That very fact, however, makes it difficult to find any particular interpretation of its intended operation "plainly erroneous or inconsistent" in relation to its text. So it is with the Director's interpretation.
 
 
 122
 Looking first to the overall sweep of that interpretation, it might possibly be thought "plainly erroneous" if it comported with no known pattern of presumptions. But that cannot be said. While its most distinctive feature--casting persuasion burdens both to invoke and then to rebut the presumption--is not the only or even the most common presumption pattern, it is certainly one not unknown in traditional usage. See generally id. at Sec. 344, pp. 974-76.
 
 
 123
 Neither is there any internal inconsistency within the Director's interpretation of the presumption's basic operation that might be thought to make it "plainly erroneous." Indeed, the Director's interpretation makes sense as a matter of practical operation. As so interpreted, the regulation meshes the opposing burdens of proof in a coherent proof scheme that addresses and permits resolution, without conflicting findings, of all elements of the basic statutory claim of black lung disability: (a) that claimant is a miner (b) who has pneumoconiosis (c) due to mine employment (d) that totally disables him. 30 U.S.C. Secs. 901(a), 902.
 
 
 124
 Turning next to the most critical specifics of the Director's interpretation, the plain words of the presumption do not negate the Director's interpretation that the proof burdens borne by both sides are persuasion burdens under a preponderance of evidence standard. The most directly operative word suggesting the nature of the burdens borne, both as to invocation and rebuttal, is "establish."[6] In common usage this imports proof of a fact, see Alabama By-Products Corp. v. Killingsworth, 733 F.2d 1511, 1514 (11th Cir.1984), rather than the mere production of evidence of a fact's existence. Cf., e.g., Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (in interpreting the judicially constructed presumption of disparate treatment in Title VII litigation, "articulating" a non-discriminatory reason connotes a mere burden of production). While a persuasion burden interpretation may not be compelled by the word "establish," that interpretation is surely consistent with the term. Indeed, it would appear to be the interpretation most consistent with the regulation's "plain words." Certainly it would be a questionable interpretation that found different burdens connoted by the same word "establish" as used on opposite sides of the presumption.[7]
 
 
 125
 The Director's related interpretation that "all relevant medical evidence shall be considered" both in assessing invocation and rebuttal of the presumption, finds flat support in the plain words of the regulation.[8] While the clause so stating appears in the rebuttal subsection, Sec. 727.203(b), of the regulation, it is found there in an introductory passage which refers to the total process of "adjudicating a claim under this subpart," i.e., Subpart C, which deals at large with the "Criteria for Determining Eligibility for Benefits." Certainly this aspect of the Director's interpretation cannot be declared plainly erroneous or inconsistent in relation to the regulation's text.
 
 III
 
 126
 There remains only the question whether the regulation as interpreted by the Director consistently with its text is nevertheless inconsistent with the statutes under which it was promulgated. Again, I do not see how it could be so found; indeed, it is perfectly consistent with both the letter and spirit of the relevant statutes.
 
 
 127
 The relevant statutory authorization begins by giving to the Secretary of Labor the responsibility and commensurate power to define by regulation the meaning of compensable black lung "total disability." 30 U.S.C. Secs. 902(f)(1), 921(b). This general power to define is obviously not unlimited; it is constrained in certain respects relevant to the Director's interpretation of 20 C.F.R. Sec. 727.203, but the Director's interpretation lies well within all the statutory constraints. I take these in order.
 
 
 128
 1. By statute, any regulations promulgated must provide that a living miner is "considered totally disabled when pneumoconiosis prevents him or her from engaging in gainful employment requiring the skills and abilities comparable to those [of his or her former mine employment]." The regulation as interpreted by the Director is consistent with this statutory constraint, by expressing it as a basis for rebutting the presumption by disproving the presumed fact of total disability. 20 C.F.R. Sec. 727.203(b)(2); see also 20 C.F.R. Sec. 410.412(a)(1).
 
 
 129
 2. By statute, the regulation may not "provide more restrictive criteria than those applicable under Section 423(d) of Title 42," the criteria for establishing "disability" for disability insurance purposes under the Social Security Act. Under the Director's interpretation, a black lung claimant's proof burden to establish disability is significantly lighter than is that of a social security disability insurance claimant. The black lung claimant need only establish, by any of various clinical tests, that he suffers one of specific medical conditions in order to place the burden of disproving his total disability from mine-employment related pneumoconiosis upon his employer. 20 C.F.R. Sec. 727.203(a)(1)-(4). By contrast, the social security disability claimant must establish a disabling impairment that at least prevents his return to former work to place on the government the burden of disproving his compensable disability. See Hall v. Harris, 658 F.2d 260, 264 (4th Cir.1981). The black lung criteria provided by Sec. 727.203 are therefore significantly less restrictive than are those imposed on social security disability claimants.
 
 
 130
 3. By statute, the regulations may not impose criteria more restrictive than those applicable to Part "B" claims. 30 U.S.C. Sec. 902(f)(2). The criteria are now identical, hence there is no inconsistency with this statutory constraint.
 
 
 131
 4. Built into the statutory criteria for determining black lung disability is a 10-year "rebuttable presumption" that pneumoconiosis suffered by a miner with ten or more years of mine employment is employment related. 30 U.S.C. Sec. 921(c)(1). The interim presumption of 20 C.F.R. Sec. 727.203 is clearly consistent with, indeed directly implements, this special proof dispensation conferred on claimants by statute.
 
 
 132
 5. By statute, any regulations promulgated are made expressly subject to the provisions of 30 U.S.C. Sec. 923(b). 30 U.S.C. Sec. 902(f)(1). Among the provisions of Sec. 923(b) is the provision that "no claim for benefits ... shall be denied solely on the basis of the results of a chest roentgenogram." As interpreted by the Director, the interim presumption is not inconsistent with this limitation on the denial of claims. Nothing in the Director's interpretation prevents a claim adjudicator, in assessing "all relevant evidence," including X-rays, from honoring this provision. The statutory provision simply makes impermissible any adjudication either that the presumption has not been invoked or that it has been rebutted "solely on the basis of the results of a chest [X-ray]" (emphasis supplied).[9] Conformably with the Director's interpretation, a single negative X-ray may not therefore be drawn upon either as the sole basis for finding the invocation burden under (a)(1) not carried nor as the sole basis for finding the rebuttal burden under (b)(4) carried.
 
 
 133
 Accordingly, neither in its general nor any of its specific aspects does the Director's interpretation give the regulation a meaning inconsistent with the authorizing statutes. That interpretation should therefore be accepted and applied by the court in conformity with the principles of construction expressed in Bowles and Larionoff.
 
 IV
 
 134
 Judge Hall's interpretation conflicts with that of the Director in two critical respects.[10] First, it would hold that the claimant's burden of proof to invoke the interim presumption is only a burden to produce evidence meeting one of the "medical requirements" of Sec. 727.203(a)(1)-(4), i.e., one positive X-ray, or one set of qualifying ventilatory or blood gas studies, or one physician's opinion and that if such evidence meets "pertinent standards for quality and authenticity," conflicting "like kind" evidence cannot be weighed against it. P. 436.[11] Second, it would hold that " 'non-qualifying test results ... cannot be used as the principal or exclusive means of rebutting an interim presumption of pneumoconiosis' under 20 C.F.R. Sec. 727.203(b)," although such test results "may be part of the rebuttal inquiry ... and are particularly relevant when they are given a detailed interpretation by an examining physician in reaching a medical conclusion as to a claimant's impairment." Id. (emphasis in original).
 
 
 135
 The first of these holdings would require us to overrule our panel decision in Consolidation Coal Co. v. Sanati, 713 F.2d 480 (4th Cir.1983), while the second would require us to reaffirm the panel decision in Whicker v. United States Department of Labor Benefits Review Board, 733 F.2d 346, 349 (4th Cir.1984).
 
 
 136
 Laying aside all concerns of deference to the agency's interpretation of its own regulation, and with all respect to Judge Hall's conflicting view, I think that view is simply wrong as a matter of original interpretation of a text's legal meaning. On that basis, independently of any special deference to the Director's contrary interpretation, I would interpret the regulation as does the Director and in consequence would reaffirm the critical holding in Sanati[12] and overrule that in Whicker and its precursor, Hampton v. United States Department of Labor Benefits Review Board, 678 F.2d 506 (4th Cir.1982).
 
 
 137
 Though, as indicated, there are a number of detailed respects in which I think Judge Hall's interpretation is logically flawed, the underlying flaws are in its violation of the statutory mandate that "[i]n determining the validity of claims ... all relevant evidence shall be considered," 30 U.S.C. Sec. 923(b), and in its failure to appreciate the interrelation of the invocation and rebuttal elements of the interim presumption of 20 C.F.R. Sec. 727.203.
 
 
 138
 An unmistakable consequence of this interpretation would be to preclude the consideration in many cases of highly relevant medical evidence respecting the validity of black lung disability claims. For example, under that interpretation, if a claimant merely "produces" one positive X-ray, i.e., one that a reader has "read positive," and that meets "pertinent standards of quality and authenticity," this effectively precludes the fact-finder's consideration, at any stage, of conflicting X-ray evidence, no matter what its relative quality and quantity. From such possibly meager, but uncontrovertible, evidence of the existence of a mere trace of pneumoconiosis, profound consequences ensue. The central element of the claim--that pneumoconiosis exists--is conclusively established. Additionally, the other elements of the claim--that the condition is due to mine employment and is totally disabling--are established unless rebutted by evidence that carries the burden of persuasion to disprove the presumed facts. Furthermore, the employer may then be prevented from rebutting the presumed facts of causation and totally disabling effect by bringing to bear what may be the very best and most trustworthy clinical evidence of the actual nature and extent of any respiratory or pulmonary impairment suffered by the claimant--ventilatory and blood gas studies. For that evidence may not be relied upon as the "principal or exclusive" means of rebuttal.[13]
 
 
 139
 With all respect, such a consequence seems to me to reveal the unacceptability of such an interpretation of this presumption's intended operation. Indeed, it might well draw the constitutionality of such an interpretation in question by making the presumption effectively irrebuttable under some circumstances. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 36-37, 96 S.Ct. 2882, 2902, 49L.Ed.2d 752 (1976) (constitutionality of statutory or regulatory presumptions may turn on admissibility of all medical evidence relevant to their rebuttal). For as I read this proposed interpretation, if a claimant invokes the presumption by putting in evidence one (or more) X-rays read positive for pneumoconiosis, and the employer then offers in evidence the testimony of any number of the most highly qualified medical experts that, based principally upon the results of properly administered ventilatory and blood gas studies, they are of the opinion that the claimant is not significantly disabled by any respiratory or pulmonary condition, that evidence simply may not be considered in rebuttal of the presumed fact of total disability by reason of pneumoconiosis.
 
 
 140
 With deference, it seems to me that the court got off the track in Whicker (actually in Hampton v. United States Department of Labor Benefits Review Board, 678 F.2d 506 (4th Cir.1982), which Whicker followed with modest refinement) in failing to recognize that such rebuttal evidence is not aimed at disproving the "established" fact of the existence of pneumoconiosis, but at the presumed fact of resulting total disability. See Whicker, 733 F.2d at 348. When this point is appreciated, consideration of such rebuttal evidence does not, as the Whicker panel saw it, "force[ ] the claimant to come forward with proof of pneumoconiosis by two or more accepted testing techniques before he could derive any practical benefit from the interim presumption." Id. It merely gives the employer a fair opportunity--which may be constitutionally required--to prove, if proof is available, that any pneumoconiosis had is not totally disabling within the statutory meaning. Other circuits have so held. See Drummond Coal Co. v. Freeman, 733 F.2d 1523, 1527 (11th Cir.1984); Peabody Coal Co. v. Lowis, 708 F.2d 266, 275 (7th Cir.1983). Of course, bare "non-qualifying" test results offered in evidence without supporting medical interpretation related directly to the degree of disability revealed might well not suffice to carry the rebuttal burden. See Peabody, 708 F.2d at 274. But it surely goes too far flatly to preclude all consideration of a qualified medical opinion of non-disability based, even "principally," upon such clinical test results. Id. at 275.
 
 V
 
 141
 Following the above analysis, I would interpret 20 C.F.R. Sec. 727.203 as follows, conformably with the Director's interpretation.
 
 
 142
 1. A living claimant may invoke the presumption that he is totally disabled by pneumoconiosis due to mine employment by proving by a preponderance of the evidence (a) that he is a miner, (b) that he worked for at least 10 years in coal mines, and (c) that (1) he has pneumoconiosis, as established by X-ray or biopsy results, or (2) he has a respiratory or pulmonary impairment, as established by ventilatory studies yielding specified clinical values, or (3) he has a blood-oxygen impairment, as established by blood gas studies yielding specified clinical results, or (4) he has a totally disabling respiratory or pulmonary impairment as established by other medical evidence including the documented opinion of a physician. 20 C.F.R. Sec. 727.203(a)(1)-(4).
 
 
 143
 2. Whether the "medical requirements" of (1)-(4) have been established is determined by weighing, under a preponderance of evidence standard, the type evidence required and produced as to each. For this purpose, no more than one such item (i.e., one positive X-ray under (a)(1)) may suffice, depending upon its quality and the quality and quantity of any opposing X-ray evidence. However, a single negative X-ray may not be relied upon to prevent proof of the existence of pneumoconiosis by a preponderance of the evidence under (a)(1). 30 U.S.C. Sec. 923(b).
 
 
 144
 3. Invocation of the presumption under (a)(1) conclusively establishes that the claimant has pneumoconiosis; it raises a further rebuttable presumption that the pneumoconiosis arose out of mine employment, see 30 U.S.C. Sec. 921(c)(1), and that it is totally disabling, see 30 U.S.C. Sec. 902(f)(1).
 
 
 145
 4. Invocation of the presumption under (a)(2) or (a)(3) conclusively establishes only that the claimant has certain levels of respiratory or pulmonary impairment; it raises the further rebuttable presumption that the impairment results from pneumoconiosis, that the pneumoconiosis arose from mine employment, and that it is totally disabling.
 
 
 146
 5. Invocation of the presumption under (a)(4) conclusively establishes that the claimant is totally disabled by a respiratory or pulmonary impairment; it raises the further rebuttable presumption that the totally disabling impairment results from pneumoconiosis, and that it arose from mine employment.
 
 
 147
 6. Upon invocation of the presumption under either one, or more, of (a)(1)-(4), the burden of persuasion is placed upon the employer to disprove by a preponderance of evidence any essential element of the claim that is only rebuttably presumed by reason of the claimant's proof invoking the presumption. Thus, if the presumption was invoked under (a)(1) (X-ray or biopsy evidence) the employer may only rebut the presumption by proving by a preponderance of the evidence that the conclusively established pneumoconiosis did not arise out of mine employment or was not totally disabling within the statutory meaning.
 
 
 148
 If the presumption was invoked under (a)(2) or (a)(3), the employer may rebut it by proving by a preponderance of the evidence that the claimant's clinically established impairment does not result from pneumoconiosis, or that if it does, the pneumoconiosis did not arise from mine employment or is not totally disabling.
 
 
 149
 If the presumption was invoked under (a)(4), the employer may rebut it by proving by a preponderance of the evidence that conclusively established totally disabling respiratory or pulmonary impairment is not pneumoconiosis, or that if it is, it did not arise from mine employment.
 
 
 150
 In any event, a single negative X-ray may not be relied upon as the sole basis for finding the presumption rebutted by disproving the presumed existence of pneumoconiosis. 30 U.S.C. Sec. 923(b).
 
 
 151
 7. If the employer fails to carry the burden of persuasion in rebuttal by the available means, the claimant is entitled to benefits by virtue of the unrebutted presumption.
 
 VI
 
 152
 Applying the presumption in this way to the appeals before us, I would decide them as follows.
 
 
 153
 * Stapleton. I would affirm the denial of benefits though not on the basis relied upon by the majority.
 
 
 154
 The ALJ improperly found the presumption invoked by virtue of the single positive X-ray reading, without considering the several negative X-rays. The Benefits Review Board, however, properly upheld the denial of benefits on the alternative ground that the presumption should not have been found invoked under (a)(1) by reason of the negative X-ray evidence, or that if invoked under (a)(2) or (a)(4) it was sufficiently rebutted by medical testimony establishing that claimant's impairment was cardiac in origin.
 
 B
 
 155
 Ray. I would affirm the denial of benefits.
 
 
 156
 The ALJ's determination that the presumption was not invoked under (a)(1) because of the overwhelming weight of seven "B" readers' negative readings in relation to one unidentified reader's positive reading and another's reading only of "suspicious for early pneumoconiosis" is supported by substantial evidence.
 
 
 157
 Similarly, the ALJ's determinations that, on conflicting test results, the presumption was not invoked under (a)(2), and that on conflicting medical opinion, it was not invoked under (a)(4), are also supported by substantial evidence.
 
 C
 
 158
 Cornett. I would affirm the award of benefits but remand for calculation of interest.
 
 
 159
 The ALJ's finding that the presumption was invoked under (a)(1) on conflicting X-ray readings is dubious. However, the finding that the presumption was invoked under (a)(2) by qualifying and near-qualifying blood gas studies, notwithstanding the evidence of non-qualifying results, cannot be reversed for lack of substantial evidence. Neither may we reverse for lack of substantial evidence the finding that, on conflicting medical testimony as to the degree of disability and as to its source, the presumption of total disability from pneumoconiosis was not rebutted.
 
 
 160
 I am authorized to say that DONALD RUSSELL, MURNAGHAN, and ERVIN, JJ., join in this opinion.
 
 SPROUSE, Circuit Judge, concurring:
 
 161
 I concur in Judge Hall's opinion. That opinion, with the author's characteristic clarity of style, correctly resolves the black lung presumption issues in a manner which both advocates and claims adjudicators would easily understand. I write separately only to respond to several issues raised in Judge Phillips' opinion. I feel it tends to confuse the issues by trying to form into a traditional mold an evidentiary scheme designed by Congress to be singularly untraditional.
 
 I.
 
 162
 The first task in our appellate review of these consolidated cases is to determine the Secretary's meaning when he published the presumption regulation. If we can determine that meaning, then we, of course, give deference to it unless it is clearly erroneous. United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 801-02, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). If, as Judge Phillips concludes, the Director's[1] interpretation of section 203 as contained in his brief were of the character that required judicial deference, we must accept that meaning unless it is contrary to the statute authorizing it. Our only task in that event would be to determine if that interpretation exceeded the authority delegated by Congress.
 
 
 163
 In my view, however, the Director's contentions advanced here as a litigant are not entitled to deference as an expression of the regulation's meaning. The posture of the Director on this appeal is essentially that of an advocate. Having received permission to intervene, he has briefed his arguments as to the meaning of the regulation creating the interim presumption. He makes no contention in his brief that he has previously or consistently interpreted the regulation as he now interprets it as an advocating party. To accept such a bald litigation statement as a binding agency interpretation is, to me, an ill-conceived application of the "deference rule."
 
 
 164
 I feel that Judge Hall's opinion captures the exact meaning of the regulation and that the position advanced by the Director is contrary to its purpose. This conflict becomes apparent upon examination of the Secretary's actions in promulgating the regulation together with a review of the statute and congressional intent in enacting its various sections. Since Judge Phillips places such great reliance on deference to the Director's position, however, I feel it important to divert here from the main thesis of my concurring opinion to explain why I think the Director's appeal position is not entitled to the judicial deference described in Bowles and its progeny.
 
 
 165
 In Bowles, the Supreme Court articulated the now frequently quoted rule that:
 
 
 166
 a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt ... the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.
 
 
 167
 325 U.S. at 414, 65 S.Ct. at 1217. The Court did not then nor has it since, however, described the type of interpretative action which is of sufficient dignity and reliability to deserve such preclusive judicial deference. In fact, the simplicity of the Bowles statement belies the extremely complex problem of judicial review of administrative regulations generally and of review of an agency's interpretation of its regulation in particular. One commentator has stated that the deference rule is not only a series of rules, but that a court's choice in using them vel non is frequently dictated by the result oriented inclination of some judges or justices.[2] See also 2 K. Davis, Administrative Law Sec. 7.22 (1979). Applying the Bowles decision, many courts, including this one, will not defer to an agency's interpretation of its previously issued regulations unless that interpretation has been "reasonably and consistently applied." Burnley v. Short, 730 F.2d 136, 139 (4th Cir.1984); Allen v. Bergland, 661 F.2d 1001, 1004 (4th Cir.1981); see also United States v. Board of Supervisors of Arlington County, 611 F.2d 1367, 1372 (4th Cir.1979). That requirement certainly makes sense considering the significant changes an agency could effect under the guise of interpretations.[3] The Administrative Procedure Act, 5 U.S.C. Sec. 551 et seq. (1982 & Supp.1985), imposes restraints on an agency's authority to make such changes. Section 552(a) provides that an agency interpretation of general application shall not be binding unless it is published in the Federal Register. 5 U.S.C. Sec. 552(a)(1)(D) (1982). Likewise, section 552(a) provides in part that
 
 
 168
 A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if [it has been indexed and published or a party has actual and timely notice of its terms.]
 
 
 169
 5 U.S.C. Sec. 552(a)(2)(C) (1982). While the relationship between these provisions under section 552 and the deference rule is not fully developed, these APA sections nevertheless illustrate the problems inherent in agency attempts to establish interpretation by intervening in litigation. There is no notice to affected members of the public that a regulation is to be interpreted in a new or controversial way. Logic and principle dictate that an agency's interpretative action be undertaken with some formal dignity.
 
 
 170
 It is true that an agency acting in the capacity of an adjudicator is usually allowed to initially interpret its regulations during the adjudication of the rights affected by the agency action. That is quite different, however, from the agency acting as a party litigant offering its litigation position for the first time as the official interpretation of the regulation in issue. This is precisely what happened here.[4] I hesitate to extend the concept of deference so as to permit any agency in such a posture effectively to resolve appeals by its own actions. This would abdicate much of the responsibility for appellate review of federal administrative agencies to the agencies for self review. I do not think Bowles contemplates such a result. Rather, agencies should be able to present their views in persuasive efforts but should only be able to present them as settled law if the interpretations have been previously and consistently applied.
 
 
 171
 Therefore, we should interpret the regulation under review either from its plain meaning or by utilizing rules of statutory construction including rules relating to the documented intent of the drafters.
 
 II.
 
 172
 I agree with my colleagues that the meaning of the regulation is not facially obvious. It is appropriate, therefore, to examine other sources including the statute and its legislative history for assistance in discerning its meaning. If we were to accept Judge Phillips' view of deference, we would look to see if the Director's interpretation is contrary to the statute. Accepting my view, it is helpful to look at the statute and its legislative history because they had a direct bearing on the substance of the regulation. Thus under either approach, it is necessary to examine the statute and, due to its complexity, its legislative history. An examination of legislative history is particularly appropriate here because the circumstances surrounding the drafting and promulgation of the interim presumption regulation represent an unusual turn in administrative law. Contrary to the usual interpretative posture, agency intent here can be inferred directly from congressional action because congressional staff worked directly with the Labor Department to tailor the final version of the interim presumption.[5] The tailoring was detailed. Importantly, in this process congressional staff struck from preliminary drafts of the regulation a proposed provision requiring the weighing of all medical test evidence to invoke the presumption. Solomons, supra note 5, at 896 n. 138. Additionally, the Labor Department would have triggered the presumption with fifteen years mine employment. Congressional staff reduced the minimum service to ten years. Id. With or without deference to the Director's position, then, the statute and Congressional intent in drafting it is a focal point of this appeal.
 
 
 173
 Turning now to the regulation, the starting point for determining its meaning is the language itself. Section 727.203 provides:
 
 Sec. 727.203 Interim presumption
 
 174
 (a) Establishing interim presumption. A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of death, or death will be presumed to be due to pneumoconiosis, arising out of that employment, if one of the following medical requirements is met:
 
 
 175
 (1) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis ...;
 
 
 176
 (2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in Sec. 410.412(a)(2) of this title) as demonstrated by values which are equal to or less than [certain values specified in the regulation's tables;]
 
 
 177
 (3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood as indicated by values which are equal to or less than [certain values specified in the regulation's tables;]
 
 
 178
 (4) Other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment; ...
 
 
 179
 (b) Rebuttal of interim presumption. In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:
 
 
 180
 (1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work ...; or
 
 
 181
 (2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work ...; or
 
 
 182
 (3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or
 
 
 183
 (4) The evidence establishes that the miner does not, or did not, have pneumoconiosis.
 
 
 184
 20 C.F.R. Sec. 727.203 (1985).
 
 
 185
 The Secretary designed section 203(a) to give the coal miner the liberal advantages mandated by Congress, and section 203(b) to preserve to the mine employer its rights by rebuttal to present all probative evidence relative to its defense of the claim. It is difficult to consider the meaning of section 203(a) without considering section 203(b) because they were designed as integral parts of one scheme. The Director's position on the meaning of section 203(a) varies crucially from Judge Hall's interpretation in which I enthusiastically join. There is, however, virtually no difference between our opinion concerning the meaning of section 203(b) and the interpretation placed on that subsection by the Director on this appeal. Moreover, Judge Phillips' opinion seriously misinterprets the Director's briefed interpretation of section 203(b)--further complicating our holdings. In sum I agree with Judge Hall that a claimant, to invoke the presumptions provided by section 203(a), must only produce one positive x-ray, one positive pulmonary function test, one positive blood gas study, or one reasoned medical opinion. I believe that the Director's position requiring proof of the invoking presumption by a preponderance of the evidence is not only erroneous under an interpretation of the regulation's language, but that it is contrary to the Congressional authority delegated to the Secretary of Labor to promulgate this regulation. In my opinion, however, Judge Hall's opinion concerning the meaning of section 203(b) is essentially the same as that advanced by the Director. The interpretation of section 203(b) espoused by Judge Phillips is contrary to the position of all parties to this appeal, including the Director.
 
 
 186
 The relevance of section 203(a)'s language was succinctly explored by Judge Hall and announced in a way that presents a useful tool for the statute's future utilization. On the other hand, Judge Phillips' attempt to universalize language designed to cover one specific social problem confuses the issue. The unique juxtoposition of concepts faced by the drafters of section 203(a) provides lively ammunition for academic exercise, but it seems to me that there is sufficient challenge in the more focused task of determining what the regulation means in light of the social ill it attempts to rectify. I find the straightforward meaning attributed to the language by Judge Hall ideal for this purpose.
 
 
 187
 Judge Phillips, however, postulates that all x-rays must be weighed by the factfinder and the presumption only triggered if, in his opinion, a preponderance of the x-ray evidence proves pneumoconiosis. If the pulmonary function, blood gas or reasoned medical opinion category is used to invoke the presumption, it must be proven to the factfinder's satisfaction that all of the evidence in that category preponderates, proving that the claimant has either pneumoconiosis or a totally disabling respiratory or pulmonary impairment.[6]
 
 
 188
 Congressional direction aside, Judge Phillips' conclusion that a triggering or invoking category must be proven by a preponderance of the evidence misconstrues both the language of the regulation and the nature of the presumption. The most striking example of this is the conclusion that section 203(a)(1) requires a trier of fact to weigh all x-rays and find from a preponderance of x-ray evidence that a claimant has pneumoconiosis before triggering a presumption that he is afflicted with the disease.[7]
 
 
 189
 The language could not be clearer.
 
 
 190
 (a) Establishing interim presumption. A miner who engaged in coal mine employment for at least ten years will be presumed to be totally disabled due to pneumoconiosis.... if one of the following medical requirements is met:
 
 
 191
 (1) A chest roentgenogram (x-ray), biopsy, or autopsy establishes the existence of pneumoconiosis ....
 
 
 192
 20 C.F.R. Sec. 727.203 (emphasis supplied).
 
 
 193
 It is easy to fault legislative draftmanship, but if, as Judge Hall would hold, the drafters of this regulation intended only one x-ray to trigger the presumption, I cannot think of a better or simpler way of saying it. On the other hand, to hold that the drafters intended a preponderance standard to apply would be to accept section 203(a)(1) as an example of intolerable drafting.
 
 
 194
 With all respect, I feel that Judge Phillips' extrapolation of his section 203(a) "preponderance" requirement in paragraph 4 of part II of his opinion disproves rather than establishes the validity of his theory. He reiterates that a presumption would be triggered vel non by weighing all of the x-ray evidence under section 203(a)(1) and deciding from a preponderance of that evidence whether the claimant was proven to have pneumoconiosis. If he is proven to have pneumoconiosis and has ten years of coal mine employment, then he is entitled to the benefit of the presumption. According to this theory, the coal mine employer may then defend under only three rebuttal provisions of section 203(b) instead of all four, i.e., (1) doing his usual coal mine work, (2) is able to do his usual work, or (3) disability not caused by coal mine work. The employer may not defend on the basis of section 203(b)(4) that he does not have pneumoconiosis because pneumoconiosis has already been proven by a preponderance of the x-ray evidence at the invocation stage.
 
 
 195
 In the same vein, Judge Phillips concludes that once the presumption is invoked under section 203(a)(4) ("other medical evidence" of a totally disabling respiratory or pulmonary impairment) the employer is entitled to defend under section 203(b)(3) not caused by employment and (4) does not have pneumoconiosis but cannot rely on section 203(b)(1) working in coal mine or (2) able to work in coal mine.
 
 
 196
 One problem with that syllogistic formulation is that it is internally inconsistent. Judge Phillips would eliminate the regulation's allowance of rebuttal possibilities (b)(1) and (b)(2) when the presumption had been invoked by section 203(a)(4) because if a miner is totally disabled, he is unable to work. By the same token, however, if a miner has proven that he has pneumoconiosis by x-ray, he is, by virtue of ten years of coal mine employment, presumed to be totally disabled and equally unable to work. To be consistent then, once a claimant proves pneumoconiosis by x-ray at the invocation stage, the employer should be stripped of three of his defenses and could rely only on section 203(b)(3).[8]
 
 
 197
 The section 203(a) "preponderance" theory espoused by Judge Phillips, moreover, is inconsistent in a more direct sense. Again, the extrapolation in paragraph 4 of Part II of his opinion illustrates the problem. The Secretary, at the prodding of Congress, designed a proof scheme which corrected perceived inequities suffered by claimants by providing them with evidentiary advantages. The regulation preserved, as constitutionally required, the right of the private party employer to defend claims, albeit from a restructured evidentiary scheme.[9] There is no indication that what were created are highly sophisticated presumptions or that they came to fruition only after long metaphysical introspection by their designers. They are simply presumptions designed to accomplish two basic purposes. The first is to compensate for the deficiency of traditional evidentiary rules, under which it was not always possible to accurately portray pneumonconiosis. The second is to switch the burden of proof to the defendant employer so as to make it easier for miners to receive benefits. The Director's litigation position, which Judge Phillips adopts, would turn this design on its head. As Judge Phillips concedes, if a weighing of the x-rays at the presumption-invoking stage would prove the existence of pneumoconiosis, that part of the proof scheme could not be disproved on rebuttal. Similarly, once total respiratory disability is proved in invoking the presumption, it cannot be disproved on rebuttal. That result is simply impossible to square with the thoughtfully created design of the regulation, which requires the erection of a presumption only in the first (section 203(a)) stage but unconditionally allows the employer to rebut the presumption under the second (section 203(b)) stage. The structuring of section 203 into two parts clearly contemplates that any ultimate proving is to be accomplished only in the second (section 203(b)) stage.
 
 
 198
 A presumption, whether you view it as evidence or as a consequence of evidence, is not ultimate proof. It is part of the equation that results in ultimate proof. Assuming there is rebuttal evidence, the ultimate proof under the section 203 scheme is decided in the rebuttal stage. Nothing could be clearer. To require ultimate proof in the invocation stage not only shifts the burden of proof, placing it on the claimant, but enmeshes in frustration the defenses allotted to the employer. The regulation allows the employer to defend on four basic grounds. Judge Phillips' theory could reduce these to only two grounds.[10]
 
 
 199
 Judge Phillips asserts that the Director's briefed position does not offend "known patterns of presumptions." The truth is that there is very little pattern to presumptions generally.[11] Nothing in the general nature of presumptions provides clues as to whether a particular presumption can be invoked by the production of a single basic or operative fact or whether a number of such facts must be weighed under a preponderance standard in order to get the presumption's benefit. That determination is often inherent to the field of law to which the presumption is attached. It is certainly inherent to the subject matter which it affects.[12] In any event, if any legal tool can be said always to operate sui generis, it is the much varied presumption. Here, Congress exhaustively examined the reasons for establishing the presumptions. Congress instructed the Social Security Administration generally and the Labor Department specifically concerning the basis of the regulation establishing the presumption. Generally, the substantive law to which it is attached will provide some clues as to how a presumption operates. Here, Congress not only created the substantive law but labored long to instruct the agencies on its procedural application.
 
 
 200
 The Black Lung Act was a response to many congressional concerns. The language is correspondingly complicated. In my opinion, the structuring of section 203 into a presumption subsection and a rebuttal subsection, together with the wording and purpose of section 203(a), establishes that the presumptions may be invoked with one positive x-ray, etc. The fact that the Social Security Administration and the Department of Labor designed this regulation by direct command and under the supervision of Congress, makes this conclusion more certain.
 
 
 201
 The final actions in drafting the regulation, moreover, were not accidental or even spontaneous. They resulted from years of efforts by Congress to make sure that the SSA and Labor Department promulgated specifically oriented regulations. Although the original Black Lung Bill as Title IV to the Coal Mine Safety Act of 1969 passed the Senate by a vote of 93-0, most of its subsequent amendments were passed only after months of congressional investigation, weeks of hearings, and detailed debate. The majority left no doubt as to their position on the controversial provisions which were the forerunners of the regulatory language at issue on this appeal.
 
 
 202
 With all respect, I think Judge Phillips and some of the parties fail to recognize the extraordinary steps taken by the authors and supporters of the legislation to assure agency regulation fit to congressional intent. Parties to this appeal, for example, contend that the interpretation adopted by Judge Hall would give coal miners advantages possessed by no other industrial workers. Much of the dissatisfaction expressed by Judge Phillips is based on the rationale that the system of proof as recognized by Judge Hall tilts the traditional burdens of proof. Certainly the system has that effect. Congress, however, specifically decreed those results. Moreover, "the Black Lung Act was not pressed into the hands of Congress by an outgoing administration ... or the United Mine Workers of America, but was initiated and conceived by Congress itself." 5 Coal Law and Regulation 100-5 to -6 (P. McGinley & D. Vish ed. 1985). Congress was concerned that this social problem had been neglected for over a century and its actions demonstrate its intention that the administrative agencies in charge of the program act with extraordinary dispatch.
 
 
 203
 Testimony before the Senate Labor and Public Welfare Committee summarized a grim report from the U.S. Public Health Service. During the Senate debate on the 1969 Act, Senator Javits included in the record of the debate an excerpt of that testimony:
 
 
 204
 ... in 1950, American coal miners died at nearly twice the rate of other workers; diseases of the respiratory system killed miners at a rate five times greater than the general working male population; and the mortality rate for American coal miners was roughly twice those reported for British coal miners.
 
 
 205
 Senate Subcomm. on Labor, Comm. on Labor and Public Welfare, 94th Cong., 1st Session, Legislative History of the Federal Coal Mine Health and Safety Act of 1969 (Public Law 91-173) As Amended Through 1974 Including Black Lung Amendments of 1972 (Comm. Print Aug. 1975) [hereinafter cited as 1975 Legislative History ], at 523.
 
 
 206
 Senators and House members expressed their feelings of shock and concern at these and similar grisly statistics. E.g., remarks of Senator McGee, id. at 580; remarks of House Education and Labor Committee Chairman Perkins, id. at 1279. Senator Javits said: "[T]his [black lung amendment] is an unusual and dramatic proposal--but it is directed at an unusual and dramatic problem--our sublime insensitivity to what is probably the worst occupational disease in the country--black lung." Id. at 522.
 
 
 207
 From the time Title IV, dealing with black lung, was added to the Coal Mine Health and Safety Act, it was obvious the Congress felt that this legislation was unique in practically every respect--never before or since has Congress chosen a single occupational disease or for that matter a single industry for specialized federal treatment and compensated its victims despite the fact that industrial side effects from other occupations have been devastating to other groups of Americans. H.R.Rep. No. 770, 94th Cong., 1st Sess. 89 (1975) (minority views); See Solomons, supra note 5, at 914-15. This is the congressional and regulatory atmosphere which generated the regulations. Congress was determined to compensate black lung victims in a specific way, and to motivate the removal of any administrative obstacle impeding that intention. See Solomons, supra note 5, at 884-95, 915.
 
 
 208
 Although the regulation, the meaning of which now divides our court, is a regulation promulated by the Secretary of Labor as the congressionally delegated administrator of the program, it originated as an interim regulation of the Social Security Administration when that agency administered the program. In the initial period of administration, few black lung claims were approved. Solomons, supra note 5, at 873. Members of both Houses intervened to speed processing and greatly increase the percentages of claim approvals over claim denials.[13] The Social Security Administration and subsequently the Labor Department responded to these congressional initiatives, both by implementing new general policies, and by enacting specific regulations and procedures. Senators Byrd, Randolph, Javits, Taft and Williams, and Congressmen Perkins, Dent, and Flood, were not only actively shepherding the legislation and its various amendments through Congress, but were looking directly at the agencies charged by Congress with the program's administration. The entirely unique impetus given all of the black lung legislation was due for the most part to the converging circumstances whereby leading legislators of both Houses of Congress were specifically interested not only in the statutory provisions but the manner in which benefit claims were administered. Solomons, supra note 5, at 876, 915.
 
 
 209
 Against this background, Congress undertook, through hearings and legislative debate, to examine the reasons claims were being denied in numbers it thought to be excessive. The congressional inquiries were detailed and concentrated on the proof schemes utilized first by the Social Security Administration and later by the Department of Labor. The hearings produced criticism of a number of evidentiary rules and adjudicatory procedures. The denial of claims on the basis of x-rays, pulmonary function tests and blood gas studies, which were thought not to provide a sufficiently reliable basis for denying claims, received the greatest congressional scrutiny.
 
 
 210
 Floor debates in both the House and Senate over a several year period demonstrate the depth and detail of Congressional interest in this specific aspect of the program. Remarks by Senator Taft and Congressman Perkins were illustrative. During consideration of the 1972 Amendments, Senator Taft said:
 
 
 211
 [It] is clear that a negative x-ray does not establish the absence of pneumoconiosis. Autopsies of coal miners indicate that pneumoconiosis does exist in a great number of cases where the chest X-ray was negative. Testimony has indicated that there is an error factor of approximately 25 percent in diagnosis when the X-ray alone is used.
 
 
 212
 1975 Legislative History at 2019-20. In 1976, during House consideration of the precursor to the legislation which became the 1977 amendments, Chairman Perkins said:
 
 
 213
 Unfortunately, the state of medical knowledge as to the diagnosis of black lung is such that often it cannot be determined until an autopsy has been performed. Not all lungs response [sic] in the same fashion to the inhalation of dust particles. Some whose lung X-rays clearly evidence the disease to a disabling extent do not appear to be disabled. The lungs of others with a long history of service in an underground coal mine produce only inconclusive X-ray findings yet manifest obvious respiratory difficulties and render such miners unemployable.
 
 
 214
 House Comm. on Education and Labor, 96th Cong., 1st Sess. Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977 (Comm. Print Feb. 1979) [hereinafter cited as "Legislative History of 1977 Act "], at 231 (Statement of Chairman Perkins during Floor debate on H.R. 10760, 94th Cong., 2d Sess. (1976)).
 
 
 215
 These opinions were based on committee testimony received during extensive hearings. In hearings of the House Education and Labor Committee prior to consideration of H.R. 10760, the Committee had heard the following testimony:
 
 
 216
 Finally, the reliance upon a negative result of a blood gas study to exclude disability, which is what I under stand the language of the bill is, is unwise. This would tend to exclude the man who has moderately severe obstructive impairment of his ventilatory capacity but who maintains relatively normal arterial blood gases; such a situation occurs rather frequently in emphysema.
 
 
 217
 Bills To Revise the Black Lung Benefits Program: Hearings on H.R. 7, H.R. 8, and H.R. 3333 Before the Subcomm. on Labor Standards of the House Comm. on Education and Labor, 94th Cong., 1st Sess. 107 (1975) [hereinafter cited as "1975 Hearings "] (statement of Dr. Leroy Lapp, West Virginia Medical Center). Dr. Lapp also testified that there was no type of medical examination that would positively say whether a claimant is entitled or not entitled to benefits. Id. at 110.
 
 
 218
 In the report accompanying the 1977 amendments, the House Education & Labor Committee stated:
 
 
 219
 Other diagnostic tools for determination of eligibility on a case-by-case basis are similarly limited. The lung function tests have shown impairment of lung function but impairment by this test has been slight and results vary widely. Lung function tests measure only the person's ability to move air in and out of their lungs and do not measure the basic function of the lung.... Other diagnostic tools ... are inadequate for other reasons.
 
 
 220
 H.R.Rep. No. 151, 95th Cong., 1st Sess. 32 (1977), U.S.Code Cong. & Admin.News 1978, 237, 268.
 
 
 221
 A number of other medical witnesses testified that respiratory diagnostic tools simply were not as effective in the presence of pneumoconiosis as they were in other respiratory diseases. The general medical consensus was that disability determinations could only be developed from a total assessment of a miner's medical condition, particularly by physicians who were familiar with the patients over a period of time. Finally, several congressmen announced that their positions were influenced by a random survey which showed that the autopsies of two hundred deceased coal miners revealed presence of pneumoconiosis in twenty-five percent of them even though x-rays contained in their medical records were negative for the disease. 1975 Legislative History at 2020-21 (statement of Senator Taft), 2069 (statement of Senator Spong).
 
 
 222
 Amidst congressional admonitions and directions, the Social Security Administration promulgated the interim regulation which was the direct predecessor to 20 C.F.R. 727.203--the Labor Department regulation now under review. The Social Security Administration designed and issued the regulation in response to severe congressional criticisms that although positive xrays, pulmonary function tests, and blood gas studies were probative of pneumoconiosis in some form, negative results of those tests were not necessarily probative of an absence of pneumoconiosis. Congressmen referred to numerous medical opinions and statistical surveys to that effect.
 
 
 223
 In the 1977 amendments, Congress, in assigning the administration of Part C claims to the Department of Labor, gave that agency authority to promulgate regulations, but at the same time circumscribed the authority with statutory directions. It instructed the agency on how to structure its regulations in several specifics, including a mandate that regulations governing Part C claims:
 
 
 224
 shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973, whether or not the final disposition of any such claim occurs after the date of such promulgation of regulations by the Secretary of Labor.
 
 
 225
 30 U.S.C. Sec. 902(2) (1982). The House of Representatives Education and Labor Committee in reporting the bill noted that the Part C interim presumption could be more liberal but not more conservative than the then existing interim presumptions. H.R.Rep. No. 151, 95th Cong., 1st Sess. 41 (1977). In enacting section 402(f) with the "no more restrictive language" Congress was, of course, aware of its own studies, its admonitions to the Social Security Administration and the Labor Department, the circumstances and reasoning of the Social Security Administration and existing case law. E.g., Prokes v. Mathews, 559 F.2d 1057 (6th Cir.1977); Bozwich v. Mathews, 558 F.2d 475 (8th Cir.1977); Henson v. Weinberger, 548 F.2d 695 (7th Cir.1977); Ansel v. Weinberger, 529 F.2d 304 (6th Cir.1976). Lacking confidence that the Department would respond even to all of that, Congressional staff worked directly with the Department in shaping the regulation to Congressional intention. See Solomons, supra note 5, at 896-97.
 
 
 226
 Establishing a positive x-ray, pulmonary function, or blood gas study, of course, is only one-half the requirement for triggering the presumption--the claimant also must have worked in a coal mine for at least ten years. Contrary to Judge Phillips' view, it is the combination of the ten-year employment and a positive test result that triggers the presumptions. At the same time Congress was investigating the failure of traditional evidentiary rules to function properly in black lung claim resolution, it was investigating the effect of the period of exposure on the probability that a coal miner suffered from pneumoconiosis, and found a demonstrable causal relationship with all three elements of a claim.[14] The ten-year employment period was legislatively conceived to be some indication of disability, its severity and causation--some evidence that the miner not only had pneumoconiosis, but that it was disabling and caused by his coal mine employment.
 
 
 227
 Seining these murky waters is by no means simple, but I think the language and structure of the regulation, the subject matter it regulates, the legislative and administrative concerns prompting the regulation--all point to one meaning--that the presumption can be invoked by establishing a single positive x-ray, pulmonary function test, blood gas studies, or other reasoned medical opinion.
 
 III.
 
 228
 Judge Hall's opinion, in resolving the second major issue of this appeal, adheres to this court's holding in Whicker v. United States Department of Labor Benefits Review Board, 733 F.2d 346 (4th Cir.1984). Both Whicker and Hampton v. United States Department of Labor Benefits Review Board, 678 F.2d 506 (4th Cir.1982), upon which Whicker was primarily based, were "rebuttal" cases--that is, they decided issues arising under section 203(b). As Judge Hall correctly notes, Whicker held that evidence consisting of a doctor's report based solely or principally upon negative x-rays, pulmonary studies or blood gas studies, is not sufficient to rebut a presumption invoked under section 203(a)(1)-(3). Although none of the parties to this appeal, including the Director, can find much fault with the Whicker holding, Judge Phillips and Judge Widener single out the panel action there as the root cause of what they conceive to be confusion.
 
 
 229
 Judge Phillips notes initially in this context that his disagreement with Whicker is separate and apart from any deference owed to the Director's position. This distinction might well be necessary in order to sustain Judge Phillips' reasoning. The Director's interpretation is virtually an adoption of the Whicker reasoning, and Judge Hall's position is essentially identical to that advocated by the Director and, for that matter, the coal mine employers who are parties to this appeal. I do not feel that we are under the Bowles constraint requiring deference to the position of the Director, which he advances in his appellate brief. Judge Phillips, however, does. Consequently, I do not understand how he bases the section 203(a) part of his opinion largely on the deference owed to the Director's position, yet espouses a section 203(b) position squarely contrary to the Director's briefed interpretation. It may well be that Judge Hall and Judge Phillips simply interpret the Director's "Whicker" interpretation in different ways. I find the Director's position straightforward. To guard against missing something, however, I quote extensively from the only source expressing the Director's position--his brief. It is as follows:
 
 
 230
 THE DOCUMENTED OPINION OF A PHYSICIAN EXERCISING REASONED MEDICAL JUDGMENT, OFFERED TO REBUT A PRESUMPTION OF DISABILITY UNDER 20 C.F.R. 727.203(b), MAY BE BASED IN PART ON THE RESULTS OF TESTS THAT DO NOT QUALIFY TO INVOKE THE PRESUMPTION.
 
 
 231
 This court held in Whicker v. U.S. Department of Labor, supra, 733 F.2d 346 (4th Cir.1984), that a party attempting to rebut the interim presumption by showing that the miner is not in fact disabled under 20 C.F.R. 727.203(b)(1), (2) or that the miner's disability was not caused, even in part, by coal mine employment under 20 C.F.R. 727.203(b)(3), (4) may utilize test results that do not qualify to invoke the presumption as long as these results are not used "as the principal or exclusive means of rebutting [the] interim presumption." Id. at 349. The Director agrees with this court that non-qualifying test results, standing alone, cannot rebut a presumption. As this court has observed, such a rule would thwart the evidentiary burdens imposed by the presumption by "effectively forc[ing] the claimant to come forward with proof of pneumoconiosis by two or more accepted testing techniques before he could derive any practical benefit from the interim presumption--a burden totally incompatible with the language and pruposes of the applicable regulations." [citations omitted][13]
 
 
 232
 Although the Director thus agrees with the panel's conclusion in Hampton, supra, 678 F.2d at 508, that "[o]nce the presumption arises, the miner's failure to satisfy the remaining tests does not rebut [it]", the Director disagrees with Hampton's further holding that a doctor's opinion may not be based in part upon nonqualifying tests. Ibid. That further holding is incompatible with the express dicates [sic] of the statute and regulations, which mandate that all probative evidence be weighed in determining whether a presumption of disability is rebutted. Thus, Section 413(b) of the Act, 30 U.S.C. (Supp. V) 923(b), provides that "all relevant evidence shall be considered [by the fact-finder], including ... medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests." The presumption itself further states that "all relevant medical evidence shall be considered" in rebuttal. 20 C.F.R. 727.203(b). Moreover, this express statutory and regulatory requirement accords with the applicable provisions of the APA, 5 U.S.C. 554, 556, 557, which require the fact-finder to receive relevant evidence and to consider it absent an express statutory direction to do otherwise.
 
 
 233
 In Whicker, supra, and in Director, OWCP v. Beatrice Pocahontas Co., 698 F.3d [sic] 680, 682 (4th Cir.1983), this court correctly recognized that non-qualifying test results are highly probative when utilized in the proper context, as documentation for the opinion of a physician exercising reasoned medical judgment. Properly utilized and interpreted, non-qualifying test results serve as critical diagnostic tools. When a physician performs a physical examination, ventilatory function and arterial blood gas tests provide significant information regarding the individual's pulmonary status; other tests, such as an electrocardiogram or a physical performance test, enable the physician to diagnose other conditions, rule out black lung disease as a source of disability, or support a reasoned opinion that the individual has no condition of any medical significance. A physician must be allowed to rely on ventilatory function and arterial blood gas test results, in conjunction with his other findings, in assessing whether or not an individual is disabled and if disabled, the degree and cause of the condition. Thus, the ventilatory function and arterial blood gas tests, together with a chest X-ray, provide the physician with the most important and reliable information relevant to a pulmonary evaluation.
 
 
 234
 ....
 
 
 235
 Brief for the Director, Office of Workers' Compensation Programs at 25-28 (emphasis added) (footnotes omitted except for footnote 13). The Director concluded by stating:
 
 
 236
 As this court recognized in Whicker, negative test results, properly interpreted and utilized in the context of a thorough medical evaluation, constitute probative evidence and must be weighed with all other probative evidence by the fact-finder.
 
 
 237
 Id. at 30 (emphasis added). Counsel for Mullins Coal Company tellingly makes essentially the same point. He states:
 
 
 238
 What is pertinent evidence on invocation may not necessarily be pertinent on rebuttal. For example raw uninterpreted pulmonary function scores, i.e. the numbers alone, convey little rebuttal information. They may, however, indicate that a burden of proof shift is appropriate because they meet table values. The same may be true for uninterpreted blood gas scores. This is the case with respect to pulmonary and blood gas studies because the results of these studies as a medical matter cannot, absent other medical data, tell anyone whether the miner has black lung or identify the cause of an impairment, or, for that matter detect the reason for a disability.
 
 
 239
 ....
 
 
 240
 The raw test scores which were relevant to invocation now have meaning only to the extent that a physician is able to attribute meaning to them. The x-rays have meaning but they cannot be conclusive. Again many other factors and physicians' views must be weighed with the x-ray. The reports will have significance on rebuttal but by placing them in the invocation portion the Secretary of Labor has simply given claimant's another basis for invocation and thus a benefit not available in Part B (20 C.F.R. Sec. 410.490).
 
 
 241
 Supplemental Brief for Mullins Coal Co. at 24-28. Likewise, counsel for Westmoreland Coal Company and Jewel Ridge Coal Corporation stated:
 
 
 242
 The employers acknowledge that a ventilatory study or a blood gas study is not legally sufficient to rebut the presumption based principally or exclusively upon the fact that it is nonqualifying under the interim presumption.
 
 
 243
 Supplemental Brief for Westmoreland Coal Co. and Jewell Ridge Coal Corp. at 24. They further quoted with approval from the decision of the Benefits Review Board in Daniel v. Westmoreland Coal Co., 5 BLR 1-196 (1982):
 
 
 244
 It is not the non-qualifying nature of the pulmonary function and blood gas tests which prompts the doctor's conclusion of no disability, or which the Board finds to be substantial evidence to rebut. (Indeed, in Sykes, supra, the Board made it clear that non-qualifying blood gas studies and/or pulmonary function studies alone would never be sufficient to rebut the presumption.) Rather, it is the doctor's expert medical opinion as to what the test values reveal regarding claimant's degree of respiratory impairment which may constitute substantial evidence to rebut. Such tests, as well as other medical data, provide documentation to support a reasoned medical opinion.
 
 
 245
 Id. at 26-27 (quoting Daniel, 5 BLR at 1-204). Counsel for Westmoreland and Jewel Ridge concluded by stating:
 
 
 246
 Under these decisions of the various Circuit Courts and the precedents of the Benefits Review Board, none of the following are sufficient to rebut the presumption in and of themselves: a ventilatory or blood gas study with reported results which is not otherwise interpreted by a physician; a physician's opinion that a coal miner is not disabled by lung disease because his performance on ventilatory or blood gas studies is better than that described in the tables of the interim presumption; or, most obviously, an opinion by a physician that the results of ventilatory or blood gas studies indicate a severe pulmonary impairment but the miner is nonetheless not disabled from his regular employment because the values are better than those set forth in the tables of the interim presumption. Each of the described variations is insufficient for rebuttal because the evidence relates to a purely legal issue which is meaningful only for invocation, rather than to the medical issue which must be addressed for purposes of rebuttal--whether the individual retains the pulmonary capability to perform his regular coal mine work.
 
 
 247
 Id. at 27-28 (emphasis added).
 
 
 248
 Two of the same members of this court were on the three-judge panels in both Director v. Beatrice Pocahontas Co., 698 F.2d 680 (4th Cir.1983) and Whicker. In Beatrice we held that a presumption invoked on the basis of x-ray evidence was properly rebutted by medical evidence showing the claimant was able to do coal mine work. Two physicians conducted an examination of the claimant which included x-ray analysis, pulmonary function tests, and blood gas studies. These tests proved negative. In Whicker, the rebuttal evidence was simply a report relying principally on nonqualifying pulmonary function tests and blood gas studies. We held that evidence to be insufficient. There were no expressed disagreements to either opinion.
 
 
 249
 Perhaps, as Judge Phillips points out, the qualifying word "principally" in Whicker, in instances may be confusing. These litigants in this case, however, have exhibited no difficulty in understanding it or securing evidence where available to meet the Whicker standard. Be that as it may, I understand Whicker and Beatrice to mean the same thing as the Director indicated in his briefed position. The employer parties to this litigation have indicated a similar understanding. Likewise, I can read Judge Hall's opinion in no other way. On the other hand, I find it difficult to recognize the rationale of Whicker and Beatrice in the parade of horribles which Judge Phillips advances as the consequences of Whicker. Hampton, Whicker, and Beatrice, like most black lung opinions, are short opinions, and for that reason a number of things could be read into them. To make my position clear, however, my agreement with Judge Hall on this point is based on his clear statement that all medical evidence can be utilized in section 203(b) defenses by a coal mine employer, including negative x-rays, pulmonary function tests and blood gas studies. They cannot, however, be used alone nor can raw test numbers have any probative effect unless they are related to the claimant's physical condition by medical documentation sufficient to show that the tests have probative validity. We cannot in one opinion solve all cases for all time. An administrative law judge must determine initially whether the evidence is sufficient in each instance. That is no more an exotic task than our obligation to review under the substantial evidence standard. It may be in given cases such as Beatrice that reasoned medical opinions analyzing the x-rays or raw tests results may be sufficient. Whether they are or not, however, should depend on their probative quality in shedding light on the condition of an individual claimant's respiratory system.
 
 
 250
 These are the same conclusions reached by the committees of Congress studying thousands of cases involving determination of disabilities by x-rays, pulmonary function tests, and blood gas studies. The consensus of practically all of the medical experts testifying before congressional committees was that each of these tests, if properly administered, might have some relevance, but that negative results standing alone have little or no probative value. Their findings suggested a discriminating use of all the tests, but would permit reliance on them as evidence only when each test is appropriately examined, explained and made relevant as part of an overall medical examination of a claimant. Congress understood this, the administrators of the programs understood this when they wrote the regulations, and the well-written briefs of the Director and the employers in this case demonstrate that they understand it as well.
 
 
 251
 I am authorized to say that HARRISON L. WINTER, K.K. HALL, and SNEEDEN, JJ., join in this opinion.
 
 
 252
 WIDENER, Circuit Judge, concurring and dissenting:
 
 
 253
 I am in the unenviable position of agreeing in part with the result Judge Hall's opinion would obtain and in part with the result which Judge Phillips would obtain. I agree with Judge Hall's opinion as to when the presumption should be invoked under sections (a)(1)-(3), but disagree with its interpretation of the rebuttal section of the regulation. I concur with the Judge Phillips construction of rebuttal section (b). It is my position that the presumption under section (a)(4) should be invoked upon a single qualifying opinion of a physician, but, absent that, the "other medical evidence" should be weighed by customary standards as Judge Phillips' opinion would decide. I concur in Part IIIB of Judge Hall's opinion concerning the award of prejudgment interest.
 
 Sections (a)(1)-(3):
 
 254
 I agree with Judge Hall that sections (a)(1)-(3) mean that a single qualifying X-ray or a single qualifying set of ventilatory or blood gas studies is sufficient to trigger the presumption. I am of the belief that Judge Phillips' interpretation would make the rebuttal section of the regulation superfluous in the event there was only one kind of evidence (X-rays, blood gas, or ventilatory studies) since it would require the evaluation of that evidence by the preponderance of the evidence standard twice: first, in invoking the presumption, and, second, on rebuttal. While the preponderance of evidence standard may be the generally accepted rule for the evaluation of evidence to establish a presumption, see, e.g., 5 U.S.C. Sec. 554 et seq., I agree with Judge Hall that the regulation as drafted supersedes this principle. See 5 U.S.C. Sec. 559.
 
 
 255
 I am persuaded in my opinion by the Congressional purpose in enacting the 1977 Amendments so thoroughly discussed by Judge Sprouse, i.e., to make it easier for a claimant to prove a claim, but more especially by the comments of the Secretary of Labor issued in connection with the final promulgation of the very regulations at issue here. They are published in the Federal Register of August 18, 1978. Comment # 2 of the Secretary, while addressing the standard on rebuttal, clearly implies that it was intended that one item of qualifying evidence would be sufficient to invoke the presumption:
 
 
 256
 [T]he Department cannot, as has been requested by some, look for the single item of evidence which would qualify a claimant on the basis of the interim presumption, and ignore other previously obtained evidence. This does not mean that the single item of evidence which establishes the presumption is overcome by a single item of evidence which rebuts the presumption.
 
 
 257
 Notice of Final Rulemaking under the Black Lung Benefits Reform Act of 1977, 43 Fed.Reg. 36826 (1978) (emphasis added). See generally 43 Fed.Reg. 36771-36831 (Aug. 18, 1978) (Notice of Final Rulemaking); 43 Fed.Reg. 17722-17773 (April 25, 1978) (Notice of Proposed Rulemaking). The Secretary's intention in promulgating the regulations is thus made clear and is contrary to the position now expressed by the Director, i.e., that the presumption is triggered only if there is a preponderance of like-kind evidence. See Judge Hall's opinion at 431; Judge Phillips' opinion at 442.
 
 
 258
 This interpretation is particularly acceptable to me in light of the fact that an X-ray or blood gas or ventilatory tests must meet precise standards prescribed by the regulations to qualify to invoke the presumption. See, e.g., 20 C.F.R. Secs. 410-426(b); 410.428; 410.430; 718.102; 718.103; 718.105; Part 718, Appendices A, B, C; 727.206 (1985). These quality standards were carefully arrived at by the Secretary, see, e.g., 43 Fed.Reg. at 36826, and indicate a degree of reliability sufficient to satisfy the claimant's initial burden to produce evidence to establish the presumption. The only human error they are subject to is the degree of skill in making and reading X-rays and in making and supervising the blood gas and ventilatory studies.Section (a)(4):
 
 
 259
 The Secretary's comments in issuing this regulation imply that the same interpretation I give to sections (a)(1)-(3) applies to section (a)(4) so far as the "documented opinion of a physician" goes. In discussing (a)(4), the Secretary commented as follows:
 
 
 260
 Some of those who commented expressed the opinion that the word "documented" in paragraph (a)(4) is unclear and should be deleted. This paragraph extends the application of the interim presumption on the basis of a medical report alone. This could not be done with respect to a claim filed on June 30, 1973. In order to justify this extension, the Department believes it is necessary to require both a documented and reasoned report. It is not, however, intended that documentation should consist exclusively of objective medical tests. It is intended that the physician's observation of the miner, personal knowledge of the miner's condition and work history, and other similar matters would constitute documentation.
 
 
 261
 43 Fed.Reg. at 36826.
 
 
 262
 But I note an inherent problem in considering in each case all available medical evidence under section (a)(4) in determining whether or not to invoke the presumption. In a case where there is a qualifying opinion from a physician and where the only evidence available is (a)(4) evidence, i.e., there are no X-rays, ventilatory studies, or blood gas studies, and all such "other medical evidence" is considered and the presumption is invoked, the very invocation has essentially made that presumption irrebuttable so far as a totally disabling respiratory or pulmonary impairment is concerned. Any available conflicting evidence will already have been considered in the presumption's invocation.
 
 
 263
 I am persuaded by the Secretary's published comments which did not come to our attention in Sanati,[1] and have not been brought to our attention here, as well as by the reasoning above, that any conflicting evidence should not be weighed under (a)(4) until rebuttal in cases in which there is a qualifying physician's opinion, and, instead, the presumption should be weighed on the basis of one qualifying opinion which meets the regulations. In cases, however, where there is no qualifying physician's opinion but there is "other medical evidence" relevant to the existence or non-existence of total disability due to a respiratory or pulmonary impairment, including, for example, lung scans (see Petry v. Califano, 577 F.2d 860 (4th Cir.1978)), physical examinations, medical histories, nonqualifying opinions of physicians, etc., that evidence must be weighed under customary standards to determine if it establishes the presumption under (a)(4).
 
 Section (b):
 
 264
 I concur in Judge Phillips' interpretation of rebuttal section (b) and would, accordingly, overrule Whicker and, of course, its predecessor, Hampton. I am of opinion that 30 U.S.C. Sec. 923(b), which for rebuttal is untrammeled by any restrictive interpretation or regulation and provides that "[i]n determining the validity of claims under this part, all relevant evidence shall be considered ...," requires consideration of all of the relevant evidence on rebuttal in determining the ultimate issue. The statutory language is so construed in subsection (b) requiring consideration on rebuttal of "all relevant medical evidence." "A more comprehensive word than 'all' cannot be found in the English language ...," Moore v. Va. Fire & Marine Ins. Co., 28 Grat. (69 Va.) 508, 510 (1877), and no reason is presented to give the word other than its ordinary meaning. I see no reason to impose artificial restrictions, as Whicker and Hampton have done, on the evidence available in finally deciding a claim.
 
 
 265
 Again, I am supported by the comments of the Secretary in issuing this regulation:
 
 
 266
 2. The many comments which urge that all relevant evidence should not be considered in rebutting the interim presumption must also be rejected. The Conference Report accompanying the 1977 Reform Act provides, in connection with the interim criteria, "except that in determining claims under such criteria all relevant medical evidence shall be considered in accordance with standards prescribed by the Secretary of Labor and published in the Federal Register." (See also Act, section 413(b).) Moreover, the Social Security regulations, while less explicit, similarly do not limit the evidence which can be considered in rebutting the interim presumption. For these reasons, the rule is not more restrictive than the criteria applicable to a claim filed on June 30, 1973, and is otherwise fully in accordance with law.
 
 
 267
 Some of the commentators felt that the "all relevant evidence" rule would cause claims adjudicators to ignore the presumption, and simply pick from all the evidence those items on which they wish to rely. This is certainly not authorized by the interim presumption. However, the Department believes that use of the presumption should be clarified.
 
 
 268
 The interim presumption is, by statute, rebuttable and the Department has no authority to make it irrebuttable. Nor does the Department have authority to exclude any relevant evidence from consideration in connection with any case, or mandate a result which is contrary to the evidence in a case. However, the Department cannot, as has been requested by some, look for the single item of evidence which would qualify a claimant on the basis of the interim presumption, and ignore other previously obtained evidence. This does not mean that the single item of evidence which establishes the presumption is overcome by a single item of evidence which rebuts the presumption. The Act embodies the principle that doubt is to be resolved in favor of the claimant, and that principle plays an important role in claims determinations both under the interim presumption and otherwise.
 
 
 269
 43 Fed.Reg. 36771, 36826 (1978) (emphasis added). The only restriction on rebuttal, then, pertinent here, is expressed directly by Congress: "no claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram [X-ray]." 30 U.S.C. Sec. 923(b).
 
 RESULTS
 Gerald L. Stapleton:
 
 270
 The ALJ properly invoked the presumption on the basis of one positive qualifying X-ray. Therefore, the Benefits Review Board's conclusion that the ALJ "erroneously invoked the presumption ... without weighing all of the X-ray evidence prior to invocation ..." is incorrect. I believe that the ALJ was correct in not invoking the (a)(4) presumption on the evidence in this case because the doctor's report most favorable to the claimant does not qualify under the regulations. Dr. Paranthaman's report states in explicit terms that: "His respiratory impairment appears to be moderate." This, of course, does not meet (a)(4)'s requirement that the respiratory impairment must be "totally disabling."
 
 
 271
 The ALJ properly considered all the relevant evidence on rebuttal, including negative and nonqualifying test results, and was supported by substantial evidence in his decision that the presumption was rebutted. I would affirm the denial of benefits.Luke R. Ray:
 
 
 272
 Because Ray presented two positive qualifying ventilatory studies (although there were also nonqualifying studies), he met his initial burden of establishing the presumption which should have been invoked under (a)(2). In addition, since the claimant has one positive physician's opinion, documented within the regulations' requirements in (a)(4), concluding that he is totally disabled due to his respiratory impairment, the ALJ should also have invoked the presumption under (a)(4). The five negative or inconclusive doctor's opinions should have been considered on rebuttal as should the negative or nonqualifying test results and X-rays.
 
 
 273
 For these reasons, Ray's case should be remanded for reconsideration in view of the presumption which was improperly not invoked under (a)(2) and (a)(4) and a proper consideration of whether in the light of all relevant evidence the presumption was rebutted.
 
 Glenn Cornett:
 
 274
 I would affirm the ALJ's determination that the presumption was invoked under sections (a)(1), (2), and (3) since the claimant produced at least one positive qualifying test in each category. The ALJ should not, however, have weighed the positive test results against the negative ones in determining whether or not to invoke the presumption.
 
 
 275
 I am of the opinion that (a)(4) is not properly before us in this case and, therefore, express no opinion concerning the presumption's invocation. Neither the ALJ nor the Board discussed section (a)(4) in this case. Also, the plaintiff did not raise this section in his claim or on appeal. Therefore, I suggest we exceed our warrant in deciding this claim on our own initiative. There is no case or controversy. United States Constitution, Article III.
 
 
 276
 I would affirm the finding that the presumption was not rebutted and the award of benefits.
 
 
 277
 For the reasons given by Judge Hall, I agree that the claim should be remanded for a calculation of interest in accordance with his opinion.
 
 
 278
 I am authorized to say that CHAPMAN and WILKINSON, JJ., join in this opinion.
 
 
 
 [1]
 See, e.g., Whicker v. U.S. Dept. of Labor Benefits Review Board, 733 F.2d 346 (4th Cir.1984), Consolidation Coal Co. v. Sanati, 713 F.2d 480 (4th Cir.1983), and Hampton v. U.S. Dept. of Labor Benefits Review Board, 678 F.2d 506 (4th Cir.1982)
 
 
 [2]
 A "B" reader is a physician who has completed a course and passed a proficiency examination conducted by the National Institute for Occupational Safety and Health for reading pneumoconiosis on x-ray films
 
 
 [3]
 The brief submitted by Mullins in this appeal informs us that Cornett died on June 22, 1983, from acute congestive heart failure
 
 
 [4]
 30 U.S.C. Sec. 902(f) provides as follows:
 (1) The term "total disability" has the meaning given it by regulations of the Secretary of Health and Human Services for claims under Part B of this subchapter, and by regulations of the Secretary of Labor for claims under part C of this subchapter, subject to the relevant provisions of subsections (b) and (d) of section 923 of this title, except that--
 (A) in the case of a living miner, such regulations shall provide that a miner shall be considered totally disabled when pneumoconiosis prevents him or her from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he or she previously engaged with some regularity and over a substantial period of time.
 (B) Such regulations shall provide that (i) a deceased miner's employment in a mine at the time of death shall not be used as conclusive evidence that the miner was not totally disabled; and (ii) in the case of a living miner, if there are changed circumstances of employment indicative of reduced ability to perform his or her usual coal mine work, such miner's employment in a mine shall not be used as conclusive evidence that the miner is not totally disabled;
 (C) such regulations shall not provide more restrictive criteria than those applicable under section 423(d) of Title 42; and
 (D) the Secretary of Labor, in consultation with the Director of the National Institute for Occupational Safety and Health, shall establish criteria for all appropriate medical tests under this subsection which accurately reflect total disability in coal miners as defined in subparagraph (A).
 (2) Criteria applied by the Secretary of Labor in the case of--
 (A) any claim which is subject to review by the Secretary of Health and Human Services, or subject to a determination by the Secretary of Labor, under section 945(a) of this title;
 (B) any claim which is subject to review by the Secretary of Labor under section 945(b) of this title; and
 (C) any claim filed on or before the effective date of regulations promulgated under this subsection by the Secretary of Labor;
 shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973, whether or not the final disposition of any such claim occurs after the date of such promulgation of regulations by the Secretary of Labor.
 
 
 [5]
 Permanent criteria, applicable to claims filed after March 31, 1980, are contained at 20 C.F.R. Part 718
 
 
 [6]
 As with x-ray evidence, ventilatory and blood gas studies must also comply with applicable quality standards. See 20 C.F.R. Secs. 206(a), 718.103, 718.105, 410.430
 
 
 [7]
 According to the construction offered in Judge Phillips' opinion, once the evidence is weighed and the presumption is triggered, it may be rebutted under Sec. 727.203(b)(1)-(4) unless it was triggered by proof under Sec. 727.203(a)(4) that the claimant had a totally disabling respiratory or pulmonary impairment or unless it was invoked by proof under Sec. 727.203(a)(1) that the claimant has pneumoconiosis. The word "unless" appears nowhere in the regulation. Similarly, under Judge Phillips' view, invocation of the presumption conclusively, i.e. irrebuttably establishes that the claimant has pneumoconiosis under Sec. 727.203(a)(1), has certain levels of respiratory or pulmonary impairment under (a)(2) or (a)(3), and is totally disabled by a respiratory or pulmonary impairment under (a)(4)
 
 
 [8]
 I am not persuaded by the contention advanced by the employers and the Director that the Administrative Procedure Act (APA), 5 U.S.C. Secs. 554 et seq., requires the presumption to be invoked under a preponderance of evidence standard. To the extent that the APA would normally be applicable on this question, I find that the statutory and regulatory scheme establishing the interim presumption supersedes the APA's evidentiary requirements
 Nor am I convinced by Judge Phillips' view, that the regulation's use of the word "establish" in both the triggering and rebuttal portions compels a conclusion that to trigger the presumption the claimant bears the burden of persuasion under a preponderance standard. "Establish," as used in Part (a) simply means that the claimant must prove at least one of the factual prerequisites to invoke the presumption, i.e. one qualifying x-ray, one set of qualifying ventilatory or blood gas studies, or the documented opinion of one physician. As used in Part (b), "establish" means that the employer must prove the facts necessary to rebut the presumption and ultimately to persuade the factfinder that the claimant is not entitled to benefits.
 
 
 [9]
 The fifteen-year rebuttable presumption at issue in United States Steel Corp. v. Gray, 588 F.2d 1022, 1028 (5th Cir.1979), is found at 30 U.S.C. Sec. 921(c)(4)
 
 
 [10]
 The legislative history to the 1972 amendments documents Congress' special concern over the inadequacy of x-ray technology in diagnosing pneumoconiosis. S.Rep. No. 92-743, p. 12 (1972), U.S.Code Cong. & Admin.News 1972, p. 2305; Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 31-34, 96 S.Ct. 2882, 2899-2901, 49 L.Ed.2d 752 (1976), United States Steel Corp. v. Gray, 588 F.2d 1022, 1027-28 (5th Cir.1979)
 The employers' and Director's contention that the presumption must be invoked by a preponderance of like-kind evidence would, with respect to x-rays, in some cases prevent the presumption from ever being triggered and thus subvert the congressional intention not to deny claims on the basis of a negative chest x-ray. This result, which Judge Phillips' opinion condones, places the regulation in conflict with the authorizing statute and is in and of itself a sufficient ground for finding the Director's interpretation invalid.
 
 
 [11]
 In reviewing the record, I note that the ALJ overlooked the reading of an x-ray dated January 3, 1977, as positive. I would require this x-ray to be evaluated on remand along with the other evidence
 
 
 [12]
 The reasonableness of this rule, as applied by the Director in his interpretation of 20 C.F.R. Sec. 725.608(a), is illustrated by the circumstances of this case. Cornett's eligibility date is July 1, 1978. Cornett, however, had terminated his employment with Mullins on April 30, 1976. He waited for more than two years after ceasing work to file a claim for benefits in July, 1978. Another fifteen months passed before Mullins first had knowledge of Cornett's claim on October 9, 1979. It was not until five months thereafter, on March 22, 1980, that Mullins first incurred liability on the claim, thirty days after the Deputy Commissioner issued his initial determination on February 20, 1980. 20 C.F.R. Sec. 725.522(a) and .530(a)
 
 
 [13]
 We note that the Seventh Circuit has recently reached the same conclusion on this issue in Peabody Coal Company v. Blankenship, 773 F.2d 173, No. 83-2399 (7th Cir.1985)
 
 
 [1]
 The relevant agency interpretation is that formally represented to us on these appeals by the Director, Office of Workers' Compensation Programs who, as administrator of the Black Lung program by delegation of the Secretary of Labor, is authorized to make the agency interpretation. See 20 C.F.R. Secs. 701.201, .202 (1979). The Director is before the court as a formal party by permitted intervention in these appeals, for the stated purpose of defending that interpretation
 Judge Sprouse fairly makes the point that agency interpretations advanced, as here, as litigation positions may be the least weighty type so far as judicial deference is concerned. Nevertheless, the one before us is given us as the official interpretation by the agency head. It is the only one we have. We effectively invited it from an interested agency not an original party to the actions. We have no indication that this interpretation, though advanced in specific litigation, is not the agency's general position, nor that it is not "consistently applied" by the agency in its base-line administration of the regulation.
 
 
 [2]
 A critical reason for the principle of deference to an agency's interpretation of its own regulations--aside from the obvious fact of authorship--is to encourage national uniformity of application. Given the range of arguably reasonable interpretations that are possible with respect to the details of a regulation such as that here in issue, the principle is particularly compelling here. Faithful adherence to the principle simply does not permit courts to substitute their own possibly "better" views of what a regulation should have provided in order best to carry out congressional intent as divined by the courts. Among other unhappy consequences of that approach is the inevitable divergence of views and applications that will emerge in judicial interpretations from circuit to circuit. Only if courts confine their review of agency interpretations to holding them within the outer bounds of the range of reasonableness contemplated by the principle of deference can the principle's aims be achieved. This necessarily requires courts sometimes to yield their possibly "better" judgments about what an agency should have written, or about how an agency should have interpreted what it, after all, has written
 
 
 [3]
 Where, as here, a presumption is to be applied by an administrative fact-finder (or a bench trial judge) rather than by a judge controlling a jury trial, its essential function is not to prescribe a rigid order of proof, but simply to dictate an orderly process of evidence assessment. A ready analogy is the process of applying the judicially created McDonnell Douglas presumption of discrimination in Title VII bench trials, as explained in Furnco Construction Co. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) ("merely a sensible, orderly way to evaluate the evidence"); see also McCormick on Evidence, Sec. 344 n. 2 (3d ed. 1984)
 
 
 [4]
 For simplicity's sake, this discussion is confined to living miner's claims--those being the only ones technically before us on these appeals
 
 
 [5]
 Judge Hall's analysis, p. 434 & n. 7, of this aspect of the Director's interpretation simply, with all deference, mistakes its import. In no way does the Director's interpretation make the "presumption," as opposed to the "basic facts" of the presumption, "irrebuttable" in whole or in part, and thus in conflict with the statutory requirement that any presumption of this sort be rebuttable
 Judge Hall's analysis seemingly fails to grasp that, as interpreted by the Director and as its text plainly contemplates, the presumption may be invoked under (a)(1)-(4) by the establishment (along with miner status and 10 years mine employment) of any one or more of four different "medical requirements." As established, these then constitute the "basic facts" of the presumption, whose "presumed facts" then vary depending upon which of the "medical requirement" basic facts have been established. For example, if pneumoconiosis' existence is established as a "basic fact" under (a)(1), its mine-relatedness and its totally disabling effect become the "presumed facts" of the presumption, and this combination of basic and presumed facts make out a prima facie claim of compensable black lung disability. Under any possible combination of basic and presumed facts arising under (a)(1)-(4) there will be some "presumed facts" subject to rebuttal under (b)(1)-(4). But only the "presumed facts" are rebuttable, not the "basic facts." Thus, continuing the example, if pneumoconiosis' existence has been "established" as a basic fact under (a)(1), that fact may not be "rebutted" (as the "basic facts," once "proven," of presumptions in general may not be), but the "presumed facts" of mine-relatedness and of total resulting disability may of course be rebutted under, respectively, (b)(3) (not mine-related) or (b)(1) or (b)(2) (not totally disabling).
 The analysis in text of this opinion, using the word "unless," which to Judge Hall suggests an irrebuttable operation, simply describes the interrelation between the particular basic facts as established under (a)(1)-(4) and the resulting presumed facts that remain rebuttable under one or more of (b)(1)-(4). That is, the existence of pneumoconiosis may be rebutted under (b)(4) unless that "fact" has been established as a basic fact under (a)(1); but in the latter case, the "presumption " yet remains rebuttable, by disproof of the "presumed facts" of mine-relatedness or of total resulting disability.
 Ironically, it is Judge Hall's interpretation that would make the presumption effectively irrebuttable in some situations. See pp. 446-447, infra.
 
 
 [6]
 This is the operative word in each of the invocation and rebuttal subsections of Sec. 727.203 except subsection Sec. 727.203(a)(3) which inexplicably shifts to the word "demonstrate" in referring to proof by blood gas studies
 The Director's related interpretation that the persuasion burden is one of proof by a preponderance of the evidence is at the least not plainly erroneous or inconsistent with the regulation's text. In fact, it is unassailable. Quite typically, the regulation expresses no standard. In such a circumstance, the preponderance standard, as the usual one in civil litigation, is presumptively the proper one. Beyond that, as the Director points out, this is the standard dictated by the Administrative Procedure Act in the absence of any specific standard's expression. 5 U.S.C. Secs. 554, 559.
 Judge Hall's basic disagreement on this point, which the court majority must accept, apparently goes to whether a persuasion burden under any standard is borne by the claimant rather than to the nature of the standard. But Judge Hall concludes that the APA standard is inapplicable because "superseded" by the relevant Black Lung statutes and regulations. Pp. 434-435 & n. 8. No support is advanced for this cryptic "conclusion" of something akin to implied repeal of the APA provisions.
 
 
 [7]
 But that is necessarily the interpretation of Judge Hall and a majority of the en banc court, when Judge Hall writes, at odds with the Director's internally consistent interpretation, that the claimant's burden to invoke the presumption is not one of persuasion by a preponderance of the evidence, but is merely one of "producing evidence which meets one of the medical requirements [of Sec. 727.203(a)(1)-(4) ]." P. 436
 
 
 [8]
 Indeed, it derives ultimately from a statutory provision to the same express effect in 30 U.S.C. Sec. 923(b)
 
 
 [9]
 Judge Hall draws upon this statutory provision as support for an interpretation that negative X-ray readings may not be considered at all in assessing whether the presumption has been invoked under Sec. 727.203(a)(1). To hold otherwise, he says, would "in some cases ... subvert the congressional intention" expressed in this provision. P. 436, n. 10
 With respect, this claims too wide an effect for the limitation. Unless it means something other than "a negative chest X-ray," it does not compel a reading that negative X-rays in general may not be considered at this stage, but only that a single one may not defeat the claim either at this or any stage.
 Under Judge Hall's apparent interpretation, negative X-rays simply have no place in assessing claims under the interim presumption when the triggering provision of Sec. 727.213(a)(1) ("a chest [X-ray]") is considered in conjunction with the limitation on proof expressed in 30 U.S.C. Sec. 923(b). This simply flies in the face of the obvious understanding, expressed in many ways in statutes and regulations and exemplified in practice, that negative X-ray readings may be introduced in evidence and considered in assessing claims under the interim presumption, subject only to the express limitation in 923(b).
 
 
 [10]
 The disagreement on critical elements is not total. On the critical aspect of the nature of the employer's burden of proof in rebuttal, the Director's interpretation is also that the burden is one of persuasion. This, of course, is the single most important aspect of the presumption so far as tipping the substantive balance is concerned. It insures a tremendous practical litigation advantage to claimants, given the narrow proffer of proof required to place this risk of nonpersuasion on employers
 
 
 [11]
 Critical to this aspect of Judge Hall's interpretation, as now accepted by a majority of the en banc court, is its emphasis on the word "a" that appears in subsections (a)(1) and (a)(4) of the regulation. This is said necessarily to import that "one" X-ray (or biopsy or autopsy?) and "one" physician's opinion suffice to trigger the presumption (and to preclude consideration of any contrary "like-kind" evidence)
 With all respect, the word "a" in these two contexts seems to me better explained as a careless imprecision than as a deliberate means of conveying the critical meaning ascribed to it by Judge Hall's analysis. The regulation at large is no more a grammarian's dream than it is a proceduralist's. Inexplicable oddities of syntax abound: e.g., the one-time shift to the word "demonstrate" in place of "establish" in Sec. 727.203(a)(3); the ungrammatical abandonment of parallelism caused by intrusion of the word "which" in Sec. 727.203(a)(3); the ambiguous placement of the "all relevant medical evidence" mandate in the regulation.
 Interestingly, Judge Hall's analysis has to abandon this literalist approach in order to bring the plural language of (a)(2) and (a)(3) (ventilatory and blood gas "studies ") into line with its single test interpretation. This is accomplished by reading the singular word "set" into those two provisions. P. 436.
 In the final analysis, this all serves merely to illustrate the futility of trying to interpret this regulation by a pick-and-choose literalist approach. The word "a" is present both in Sec. 727.203(a)(1) and (a)(4), and in 30 U.S.C. Sec. 923(b), and cannot be read out of either. Looking to total context, the most rational interpretation is that "a" single positive X-ray (or physician's opinion) may, but need not necessarily, trigger the presumption under Sec. 727.203(a)(1) or (4), and that a single negative X-ray may never provide the sole basis either for finding the presumption not invoked or for finding it rebutted once invoked under 30 U.S.C. Sec. 923(b). So, I think, should we interpret it. See Part V, infra.
 
 
 [12]
 Sanati actually dealt directly only with the triggering effect of medical opinion under Sec. 727.203(a)(4), but its analysis related more broadly to the operation of all the "triggering" provisions, (a)(1)-(4). Critically, and correctly in my judgment, Judge Widener's conclusion for the panel majority was that the presumption can only be triggered under any of these subsections by a preponderance of the evidence, i.e., that conflicting "like-kind" evidence must be considered. See Sanati, 713 F.2d at 482
 With all respect, I think Judge Widener's retreat now from Sanati is not warranted, certainly not by the cryptic (indeed legally incomprehensible) comment by the Secretary that he thinks compels his retreat. See 466 n. 1. If this comment proves anything it is that it was intended by the Secretary that all like-kind medical evidence should be considered both in determining whether the presumption is invoked and whether it is rebutted.
 
 
 [13]
 Aside from the fundamental point that this limitation on proof flies in the face of the statutory and regulatory mandate for consideration of "all relevant evidence," its exact meaning as expressed in Whicker seems to me so unclear that it is bound to produce great confusion in the adjudication of claims. Presumably it would spawn major inquiry into the exact extent that ventilatory and blood gas studies may have influenced medical opinions. The standard of "principal or exclusive" would seem unmanageable on any principled basis. Certainly it would provide a wider latitude for judicial review of particular determinations than can be healthy for either the administering agency or for the courts or, more importantly, for primary agency administration of the program as intended by Congress
 
 
 [1]
 The Secretary of Labor is the delegated authority to administer the relevant portion of the Black Lung Program and he promulgated the regulations which we now review. The Director of the Department's Workers' Compensation Program is the Secretary's designated administrator
 
 
 [2]
 Weaver, Judicial Interpretation of Administrative Regulations: The Deference Rule, 45 U.Pitt.L.Rev. 587 (1984). The author states:
 The Supreme Court has never acknowledged the fact that it has created multiple deference standards. Instead, when it wants to apply the deference rule, it simply chooses one of the deference standards and acts as if that one is the only standard. Thus, the Court never explains either why it has chosen one standard over another or when each should be applied. The Court has indicated that the "demonstrably irrational" standard, a controlling standard, is of limited applicability. However, it appears to treat the "plainly erroneous" standard as generally applicable, even though it is also controlling, and it gives an administrative interpretation as much deference as the "demonstrably irrational" standard. Furthermore, the Court has not indicated when the "plainly erroneous" standard should be applied as opposed to the "reasonable, consistently applied" standard, or some non-controlling one such as the "greatest weight," "deference," and "respect" standards. Each of these latter standards appears to be generally applicable.
 Id. at 595. (emphasis in original) (footnotes omitted).
 
 
 [3]
 Weaver has observed:
 Political considerations may also discourage an agency from interpreting its regulations consistently and fairly. Often a regulation is promulgated by an agency under one presidential administration and then interpreted by that agency under a subsequent administration. If the regulatory philosophy of the later administration differs from that of the promulgating administration, an agency may alter its interpretation of its regulations. Such shifts in regulatory philosophies are not uncommon. Evidence of alternating political philosophies appears in the transition from the Johnson administration to the Nixon, Ford, Carter, and Reagan administrations. Without drawing any conclusions about the desirability of any particular regulatory philosophy, the fact remains that agencies will change their interpretations of regulations over time.
 Weaver, The Deference Rule, supra note 2, at 612-13 (footnotes omitted).
 
 
 [4]
 In this case, we granted the Director's motion to intervene. There is a question in my mind, however, whether such motion is necessary because he may have standing as a matter of right in every appeal. The Act provides: "[t]he Secretary shall be a party in any proceeding relative to a claim for benefits under part (C)." 30 U.S.C. Sec. 932(k) (1982). See Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding and Dry Dock Co., 676 F.2d 110, 113-14 (4th Cir.1982)
 
 
 [5]
 Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of Its Unresolved Issues, 83 W.Va.L.Rev. 869 (1981). The author states:
 The final draft of the Labor Department's regulations were approved within the Department and, prior to publication, sent to selected congressional staff members for review and presumably for approval. These regulations were reviewed by both congressional staff and professional persons associated with the various black lung associations. As a result of this initial review, the Department's proposed "interim presumption," after close scrutiny, was severely criticized. Other parts of the regulations were also criticized, thus failing to win the approval of those reviewing the proposal.
 Id. at 896. In particular, Solomons notes:
 One of the proposed sections would have prohibited the approval of a claim unless the file demonstrated that a full series of medical tests had been conducted. The Black Lung Association and congressional staff objected strenuously and the section was removed. Another provision would have required the adjudicator to weigh all the medical test evidence to determine whether the weight of this evidence established total disability. This too was stricken by congressional command. One very important section in the draft attempted to clarify the confusion over whether qualifying pulmonary function studies would invoke the interim presumption with 15 or 10 years of coal mine employment. The SSA presumption seemed to require 15 years but in practice SSA awarded benefits with qualifying pulmonary function scores and 10 years. The draft Labor presumption required 15 years. The clarification was also vetoed by the group in favor of the SSA practice of using 10 years for this purpose.
 Id. at 896 n. 138 (emphasis supplied). Finally, Solomons observes:
 In light of the severe criticism evoked by these proposed regulations, the Department of Labor sought to formulate more acceptable regulations. This was accomplished and the new interim standards were published as a proposal on April 25, 1978.
 Id. at 897. Mr. Solomons was counsel for the involved Labor Department Branch from 1973-1978 when the regulation was drafted.
 
 
 [6]
 The Labor Department's proposed regulation would have included a similar requirement for weighing, but this provision was stricken at the insistence of congressional staff. Solomons, supra note 5
 
 
 [7]
 Judge Phillips' conclusions as to Sec. 203(a)(2) and (3) are equally erroneous. My reasoning in Consolidation Coal Co. v. Sanati, 713 F.2d 480, 483 (4th Cir.1983) (Sprouse, dissenting), was also erroneous in this respect. I am well persuaded by Judge Hall's reasoning on page 432 of his opinion
 
 
 [8]
 I recognize Judge Phillips' sua sponte division of the presumptions as explained in the text of his opinion and in his footnote 5. No one could disagree that the fundamental nature of a presumption presupposes facts upon which the presumption is to be based and the presumed effect whether it be a presumed legal effect or a presumed factual effect. I, like Judge Hall, simply cannot agree, however, that a presumption can be split into operating on basic facts on the one hand and presumed facts on the other in such a manner as to defeat the purpose of the presumption. This can be done easily with any presumption as Judge Phillips has done by simply assigning attributes to the basic facts which were not conceived by the designers of the presumption. In the first place, I do not recognize this subdivision of the presumption regulation as the position of the Director or of any party. It is certainly not to be found in any of the regulatory language nor in the Director's interpretation contained in his brief. A proper function of a court, to be sure, may be to devise new ways to solve old problems and I do not quarrel with that. In this instance, however, I feel it contravenes the meaning of the statute directing the Department of Labor to design these regulations and the intention of the Director in designing them. As I indicate, infra, the fact of ten years or more employment was considered to be probative of the presence of pneumoconiosis, its disabling effect, and its coal mine causation. The showing of pneumoconiosis or a total respiratory disability by the means expressed in Sec. 203(a)(1)-(4) also was meant to be probative of but not proof of coal mine related, totally disabling pneumoconiosis. Neither this triggering data nor a combination of such data is irrebutable because it is emphatically provided that the combined effect is to raise a presumption which can be rebutted by utilizing all relevant evidence in accordance with Sec. 203(b). I can only conclude from all of this that the presumptions are unitary; it takes a combination of ten years plus satisfying one of the categories to invoke the presumption. Both the ten year increment and an x-ray, pulmonary test, blood gas test or other medical evidence have probative values relating to all three elements of the presumption, i.e., disease, disability, and causation. In one sense, Judge Phillips' theory would convert the rebuttable presumption to an irrebuttable one. Another view, however, is that in proving pneumoconiosis at a place designed for mere invocation of a presumption, a claimant has (given the ten years of employment) proven his case--that he is totally disabled from pneumoconiosis as a result of coal mine employment
 
 
 [9]
 Congress was well aware that medical evidence in black lung cases generally is treated differently at every stage than in traditional litigation. In the first place, there is very little testimony and opportunity for cross examination. Ninety-five percent of all medical evidence consists of doctors' reports received by the ALJ without the doctors' presence at the hearing. Smith, The Basics of Federal Black Lung Litigation, 83 W.Va.L.Rev. 763, 788-89 (1981). In appropriate instances, the ALJ should weigh the medical reports and decide medical issues on a preponderance standard. There is no realistic way to enforce that standard, however, since necessarily administrative and judicial bodies affirm the factfinding if there is only substantial evidence to support it
 
 
 [10]
 There is yet another failing to this "preponderance on invocation" reasoning. Judge Phillips reasons that a "(b)(4)" defense cannot be raised in rebuttal to an "(a)(1)" presumption; and that "(b)(1) & (2)" defenses cannot be raised in rebuttal to an "(a)(4)" presumption. This fails to recognize the basic interrelation between presumptions and evidence. According to the Director's briefed position, a number of x-rays are weighed, and a presumption invoked by a preponderance of the evidence. Judge Phillips goes even farther and would hold that this would irrebuttably prove pneumoconiosis to the exclusion of any rebuttal evidence
 Section 203(b), however, states that all relevant evidence can be considered on rebuttal. It is true that nothing would be gained by weighing all x-ray evidence at invocation and, again, on rebuttal, but x-ray evidence is only one type of medical evidence bearing on the factual issue of pneumoconiosis. A lung biopsy or autopsy, for example, would be superior evidence. Section 203(b)(2) & (3) test results accompanied by appropriate supporting documentation would not be direct evidence of pneumoconiosis but would be circumstantial evidence probative of its presence vel non.
 Likewise, a doctor's opinion of total respiratory disability is one kind of evidence of inability to work--there are several other types of medical and nonmedical evidence which might counter the medical evidence. Section 203(b) preliminarily speaks to relevant medical evidence, but 203(b)(2) speaks only to relevant evidence generally. In other words, under the proof scheme originally conceptionalized by the regulation, a part of the factfinder's function in the section 203(b) rebuttal phase is to weigh one kind of evidence against another. Judge Phillips' extrapolation would limit this function and make it more difficult both for a claimant to invoke a presumption and for an employer to rebut it. The regulation is designed to have the exact opposite effect. The presumption is to be easily invoked, but the employer is to have wide latitude in presenting its rebuttal evidence.
 
 
 [11]
 See Allen, Presumptions in Civil Actions Reconsidered, 66 Iowa L.Rev. 843, 843 (1981), wherein the author states:
 The longstanding controversy over the nature and proper rule of presumptions in civil actions continues undiminished, and the confusion generated by the controversy similarly shows no signs of abating.
 All the standard texts on evidence, of course, discuss not only the various attributes of presumptions, but the confusion that surround them. Professor Allen in his article, however, articulates a more basic approach for considering and using presumptions. One statement in his article is particularly applicable to this case:
 Moreover, it is the failure to recognize that the word "presumption" is simply a label applied to a range of evidentiary decisions that has caused essentially all the confusion and controversy surrounding presumptions, as well as doomed to failure the extensive efforts to elaborate on the nature of presumptions. Rather than engaging in the futile task of attempting to reconcile the many usages of the word "presumption," efforts would be better spent by analyzing the evidentiary problems that underlie the use of the label.
 Id. at 845. See also McCormick, Evidence Sec. 342 et seq. (3d ed. 1984); 1 Weinstein, Evidence p 300 et seq. (1985).
 
 
 [12]
 Presumptions are both legislatively and judicially created. They are varied and difficult to categorize much less compare, and they take the legal coloration of the field of law in which they apply. See generally 1 Weinstein, Evidence p 300 et seq. (1985). The most superficial research reveals why they are difficult, if not impossible, to characterize. Examples demonstrating this are: GENERALLY: A person acting in public office was regularly appointed to it. Official duty has been regularly performed. A court, or judge acting as such, whether in this state or any other state or country, was acting in the lawful exercise of the jurisdiction of the court. Evidence willfully suppressed would be adverse to the party suppressing it. A person is the same person if the name is identical. A person not heard from in seven years is dead. A death occurring from unexplained and violent external means is accidental. When a test reveals presence of drugs in a harness horse, rebuttable presumption exists that trainer was culpable and may be suspended. CONTRACT: Payment of earlier rent or installments is presumed from a receipt for later rent or installments. An obligation delivered to the debtor has been paid. Private transactions have been fair and regular. The ordinary course of business has been followed. A promissory note or bill of exchange was given or indorsed for a sufficient consideration. An indorsement of a negotiable promissory note, or bill of exchange, was made at the time and place of making the note or bill. A writing is truly dated. A letter duly directed and mailed was received in the regular course of the mail. Money paid by one to another was due to the latter. REAL ESTATE: Owner of legal title is the owner of full beneficial title. An uninterrupted adverse possession of real property for a period of years has been held pursuant to a written conveyance. DOMESTIC RELATIONS: A child born in lawful wedlock is legitimate. CRIMINAL: An accused is innocent until his guilt is proven beyond a reasonable doubt. An accused is presumed to be sane. Persons are presumed to know the law of the state in which they reside. TORT: A person intends the ordinary consequences of a voluntary act. When there is a statutory violation, negligence is presumed. When there are no eyewitnesses, the claimant in an accident exercised due care
 
 
 [13]
 An approval rate of 50% under the SSA fell to only 10% under the Department of Labor administration of the Act prior to the 1977 amendments. Stephens & Hollon, Closing the Evidentiary Gap, 83 W.Va.L.Rev. 793, 817 (1981); Solomons, supra note 5, at 873 n. 14
 
 
 [14]
 During the three years in which Congress considered the various precursors of the 1972 Amendments, it received a great deal of testimony about the correlation between the period of exposure and the evidence of the disease
 Dr. Murray V. Hunter, Medical Director, Fairmont Clinic, Fairmont, West Virginia, testified before the House Education and Labor Committee, that exposure over time produces pneumoconiosis and that a presumption of disability because of exposure over time represents sound policy. 1975 Hearings, at 171.
 At the 1975 hearings on various black lung amendment proposals, Dr. Dan Fine, New Kensington Miners Clinic, stated:
 ... and accepting the reasonable presumption that deposition of coal and silica and other minerals in the lungs is a deleterious body burden, it would seem eminently fair and humane to recognize as a matter of law that the passage of a given number of years as a coal miner is, in and of itself, reasonable evidence of a substantial burden of lung damage from coal mining and to compensate the miner accordingly.
 1975 Hearings, at 117.
 Congressman John Erlenborn was the principal spokesman for the opposition to Black Lung provisions including those relating to the interim presumptions. He protested that the interim presumptions, in effect, created an automatic entitlement based on years of employment alone. H.R.Rep. No. 770, 94th Cong., 1st Sess. 99-102 (1975); (separate views of Congressman Erlenborn); H.R.Rep. No. 151, 95th Cong., 1st Sess. 94-96 (separate views of Congressman Erlenborn).
 Congressman Paul Simon, in supporting the bill, noted that an autopsy study of 400 coal miners with 21 years or more in the coal mines showed that 90-95% of them had pneumoconiosis. Legislative History of 1977 Act, at 282-83 (statement of Congressman Simon on House Floor in 1976 in support of H.R. 10760, legislation similar to legislation which in the following Congress became the 1977 act).
 In its report accompanying the 1977 amendments, the House Education and Labor Committee wrote:
 There is some autopsy data that provides a basis for some important and more reliable conclusions. Data collected from 405 autopsies as part of the National Coal Workers Autopsy Study at the Appalachian Laboratory for Occupational Respiratory Diseases (ALFORD) shows that of all the miners examined, 84 percent had CWP. When these autopsies were arranged by years worked underground, there was a sharp increase in the percentage of cases after fifteen years, with those with less than fifteen years underground showing 64 percent with CWP and those with more than fifteen years underground showing 88 percent with CWP.
 H.R.Rep. No. 151, 95th Cong., 1st Sess. 31 (1977), U.S.Code Cong. & Admin.News 1978, p. 267.
 
 
 [13]
 Moreover, non-qualifying test results without more are not even probative evidence in rebuttal. Uninterpreted ventilatory and blood gas studies, unrelated to the results of a physical examination or to a clinical history, do not indicate whether an individual is actually disabled. Similarly, a negative X-ray by itself is not probative evidence of the absence of pneumooconiosis. Thus, the Act provides that a claim cannot be denied solely on the basis of negative X-rays. 30 U.S.C. (Supp. V) 923(b). See Usery v. Turner Elkhorn, supra, 428 U.S. at 31-32 [96 S.Ct. at 2899-2900]
 
 
 [1]
 As I see this case, Sanati should not survive on its facts which included in the record a qualifying physician's opinion under (a)(4), which we held should not alone invoke the (a)(4) presumption, but should be weighed against other nonqualifying reports. Only its reasoning should survive as it applies to the (a)(4) presumption where there is not a qualifying opinion of a physician
 The fact that the key authority, the August 18, 1978 Federal Register, was not brought to our attention in Sanati, nor in this case, does little to minimize my feeling of embarrassment in not finding that authority in the Sanati case and announcing my withdrawal from my earlier position in Sanati. With Judge Boreman, the best I can do is to paraphrase Gandhi that it is better to be consistent with truth as it may present itself at a given moment than to be consistent with a previous statement I have made on a given question. See Shiflett v. Commonwealth, 447 F.2d 50, 62 (4th Cir.1971) (Judge Boreman, concurring).